Herbert MENDEL, individually and on behalf of a class of shareholders of Katy Industries, Inc., Plaintiffs,

v.

Wallace E. CARROLL, et al., Defendants.

PENSLER CAPITAL PARTNERS, I.L.P., a Delaware limited partnership, and Pensler Capital Corporation, a Delaware corporation, Plaintiffs,

v.

KATY INDUSTRIES, INC., a Delaware corporation, Wallace E. Carroll, Jr., et al., Defendants.

Civ. A. Nos. 13306, 13386.

Court of Chancery of Delaware, New Castle County.

Date Submitted: March 17, 1994.
Date Decided: June 17, 1994.

Brian P. Glancy, of Schlusser, Reiver, Hughes & Sisk, Wilmington, David B. Kahn and Mark E. King, Northfield, IL, and Charles Barnhill, of Davis, Miner, Barnhill & Galland, P.C., Madison, WI, for Herbert Mendel.

Grover C. Brown and Joseph C. Schoell, of Morris, James, Hitchens & Williams, Wilmington, and David T. Eames, of Bodian & Eames, New York City, for Pensler Capital Partners, I.L.P. and Pensler Capital Corp.

Kenneth J. Nachbar, Alan J. Stone and Michael L. Vild, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Bartlit Beck Herman Palenchar & Scott, Chicago, IL, for defendants Wallace E. Carroll, Jr., Denis H. Carroll, Lelia Carroll Johnson, Philip E. Johnson and Arthur R. Miller.

Allen M. Terrell, Jr. and Allison L. Amorison, of Richards, Layton & Finger, Wilmington, for defendants William F. Andrews, C. Felix Harvey, John Stuart Hunt and Lutz Raettig.

Lawrence C. Ashby and Christopher S. Sontchi, of Ashby & Geddes, Wilmington, for defendants Doyle G. Berry, William H. Murphy, Charles W. Sahlman, Jacob Saliba, Reginald N. Whitman and Katy Industries, Inc.

## OPINION

ALLEN, Chancellor.

The pending application for a mandatory preliminary injunction requires this court to revisit a subject dealt with, albeit not very completely, on an earlier application for a preliminary injunction. *See Freedman v. Restaurant Assoc. Indus., Inc.*, Del.Ch., C.A. No. 9212, 1987 WL 14323, Allen, C. (Oct. 16, 1987). As in *Freedman*, the stockholder plaintiffs in these consolidated actions seek an unprecedented remedy: an order requiring the board of directors of a Delaware corporation to grant an option to buy 20% of its stock to a third party for the primary purpose of diluting the voting power of an existing control block of stock. The order sought would direct the Board of Directors of Katy Industries, Inc. ("Katy") to grant to an affiliate of Pensler Capital Corporation (together with Pensler Capital Partners I.L.P., referred to here as "Pensler") an option to purchase up to 20% of Katy's outstanding common stock at $27.80 per share. The granting of such an option is a condition of an offer for a $27.80 per share cash merger extended by Pensler[1] to Katy. The proposed merger is said by plaintiffs to be without other material conditions.

Katy's board of directors has declined to grant the option sought. The board took this position in the face of a claim by a group of related shareholders (the Carroll Family) that granting such an option would deprive them of their legitimate and dominant voice in corporate affairs, and would in the circumstances constitute a breach of fiduciary duty.

Plaintiffs' theory, stated most summarily, is that when the Katy board had earlier resolved to accept the terms of a $25.75 cash out merger proposed by the Carroll Family, the company was put up "for sale," and that as a result the board now has a single duty: to exercise its active and informed judgment in a good faith effort to get the best available value for the stockholders. Plaintiffs contend that rejection of Pensler's $27.80 merger proposal is not consistent with that goal. They posit that granting the option sought is a necessary step for the board to satisfy its special duty (which plaintiffs call a "Revlon duty"[2]), and thus it is obligated in these circumstances to do so.

The notable fact in this case is that at all relevant times a small group of Carroll Family members has controlled between 48% and 52% of Katy's voting stock. In fact, this group has coordinated its activities informally and through legal agreements. With a single exception, accounting for about 5% of the stock, this group has steadily taken the position that it would buy, but it would not voluntarily sell Katy stock. Thus, members of the Carroll Family early and continually announced active resistance to Pensler's proposal.

Following Pensler's September 1993 initial proposal, the Special Committee of the Katy Board withdrew its recommendation of the Carroll Merger. In December 1993 the Carroll Family withdrew its offer. To evidence its *bona fides* in withdrawing the offer, the Carroll Family further offered to execute a standstill agreement stating that it would not acquire additional Katy shares beyond some open market purchases certain family members had made in December.

The dilutive option sought by Pensler as a condition of its $27.80 offer is, of course, a means of overcoming the resistance of the Carroll shareholders. Exercise of the option sought would reduce the voting power of the Carrolls from their current level of 50.6% to approximately 40% and thus make feasible stockholder approval of the Pensler transaction. A Special Committee of the Katy board of directors, delegated to deal first with the Carroll Family proposal and then with Pensler, after obtaining advice from legal counsel, declined to recommend to the full board the granting of the dilutive option.

---

**1.** Pensler teamed up with Steinhardt Enterprise Inc., ("Steinhardt") in making this offer to acquire all of Katy's stock. Steinhardt is not a party to this suit, and, as discussed below, the Steinhardt Pensler offer has now expired. For ease of discussion, the offer will be referred to as the "Pensler" or "Steinhardt Pensler" offer.

**2.** *See Revlon, Inc. v. MacAndrews & Forbes Holdings Inc.*, Del.Supr., 506 A.2d 173 (1986); *see also Paramount Communications v. QVC Network*, Del.Supr., 637 A.2d 34 (1993).

Plaintiffs filed this suit in February 1994, after the full board announced its intention to declare an extraordinary $14.00 per share dividend. In addition to the mandatory granting of a stock option, plaintiffs also seek an order: requiring the defendants to negotiate fairly with Pensler; prohibiting the voting of certain shares recently acquired on the market by certain members of the Carroll Family; prohibiting Katy from making certain payments; and prohibiting Katy from distributing the $14.00 special dividend authorized in March 1994 by the board of directors. On the last point, it is plaintiffs' contention that the special dividend is in fact an alternative to Pensler's value-maximizing proposal, and for that reason constitutes a violation of what they take to be the on-going special duties arising from the board's decision to approve the now withdrawn Carroll Family proposal.

For the reasons that follow, I conclude that the board of Katy Industries is not under any special duty at this time to maximize the current value of the public shares or of the company's stock as a whole. Thus, I reject the premise of the principal theory offered by plaintiffs to justify the strong relief they seek. More broadly, assuming that the radical step of granting stock for the primary purpose of affecting the outcome of a shareholder vote or tender could be justified under some set of circumstances, I can see here no overreaching or palpable breach of fiduciary duty by a controlling shareholder that might justify such a protective reaction. *See Freedman v. Restaurant Assoc. Indus., Inc.,* Del.Ch., C.A. No. 9212, 1987 WL 14323, Allen, C. (Oct. 16, 1987); *Blasius Indus., Inc. v. Atlas Corp.,* Del.Ch., 564 A.2d 651, 659–63 (1988). Thus, as more fully set forth below, the application for a preliminary injunction will be denied.

## I.

Katy is a New York Stock Exchange listed firm, founded in 1968 by Wallace E. Carroll, Sr. As a practical matter, control of Katy has always rested in the hands of Mr. Car-roll, Sr. or his children. During periods relevant to this suit, the Carroll Family (defined here as Mr. Carroll, his three sons, his daughter Lelia Carroll Johnson and her former husband Philip, and affiliated trusts or other interests) has owned between 48% and 52% of Katy's outstanding common stock. Traditionally these interests were held in a coordinated way. In 1983, all of the Carroll Family Members entered into a Stock Purchase Agreement. That agreement granted a right of first refusal to other signatories with respect to all Katy stock owned, but contained no restrictions on the exercise of voting rights.

In August 1988, the Carroll Family's holdings of Katy stood at approximately 48%. At that time, the board of directors authorized the Company to repurchase up to 500,000 of the nine million shares outstanding. No shares, however, were acquired under that authority at that time.

Wallace Carroll, Sr. died in September 1990. In March 1991 Katy retained Dillon, Read & Co., Inc. to conduct a financial review of the company, and "to advise the board on a variety of financial alternatives available to [Katy]." Kurowski Aff. Ex. A. Among the Dillon, Read personnel assigned to that project was Mr. Sanford Pensler, now a principal in Pensler Capital Corp. In its August 1991 report Dillon, Read noted that "Katy appears to be awash in capital" and that "[i]t is unlikely the public markets will give full value to this collection of assets in its present configuration." Kahn Aff. Ex. B at 307. Several strategic options were presented, including a "split off" of operating subsidiaries and the repurchase of "substantial amounts of equity." *Id.* at 321–22. Dillon, Read noted that "investment in Katy's own shares appears to be very attractive." *Id.* at 323.

In fact, Katy had already privately repurchased a substantial block of common stock in June 1991. It made another negotiated purchase in September, after receiving the investment bank's analyses.[3] The June repurchase brought the Carroll Family's aggre-

---

3. Katy purchased 210,900 shares in June from IBM, and in September it bought 371,250 shares from Sasco Capital.

gate common stock ownership to over 50%; the September repurchase increased that aggregate interest to over 52%. Katy later repurchased another 5,800 shares in the market in April 1992.

## A. The Family Buyout Proposal

Members of the Carroll Family retained Morgan Stanley & Co.[4] to advise them with respect to their holdings in Katy. In June 1992 the Carroll Family publicly announced that it was reviewing its options concerning Katy. At that time Katy stock had been trading at about $16.00 per share. On September 1, 1992, the Carroll Family executed a Participation Agreement in which they agreed to act in concert in the acquisition of the publicly held shares of Katy.[5] On that same day, the Carroll Family offered to acquire all non-Carroll shares of Katy common stock at $22.00 per share.[6] In the intervening months the stock had risen to trade on the day prior to the announcement at $24.00 per share.

In presenting its proposal, the Carroll Family advised the board that it had no interest in selling any of its approximately 52.6% of Katy's common stock. In response to the offer, the board appointed a Special Committee[7] comprised of directors who were apparently disinterested in the proposal. They retained the investment bank Goldman Sachs & Co., as well as the Dallas law firm Jenkens & Gilchrist, P.C., as counsel. After consideration, the Special Committee reject-

ed the $22.00 offer as inadequate and attempted to negotiate a higher price with the Carroll Family. The Carroll Family offered $24.00 per share, but the Special Committee insisted on $26.00 per share. No agreement was reached and the Carroll Family withdrew its offer. The Special Committee was disbanded in December 1992.

On March 11, 1993, the Carroll Family made a new offer to purchase all outstanding non-Carroll Katy shares at $25.75 per share. In conjunction with the new offer, the Carroll Family amended the Participation Agreement to enable Barry Carroll and his affiliates to sell their 4.6% holding in Katy stock (hereinafter, "Barry Carroll's shares").[8] The Special Committee was reinstituted and advised of the treatment of Barry Carroll's shares. After Goldman Sachs indicated that it would render an opinion that $25.75 represented a price within a range of fair prices for the public stock, the Special Committee concluded that the new offer was in the best interests of Katy's shareholders, and recommended the offer to the full board. The board approved that offer on March 15, 1993, and authorized the officers of Katy to enter into a merger agreement with a Carroll Family-controlled entity on March 23. A proxy statement was mailed to shareholders on August 23, 1993.

## B. A Rosecliff/Pensler Proposal Emerges

In a September 1, 1993 letter to Mr. Jacob Saliba, Katy's Chairman, a venture called

---

4. Morgan Stanley was retained by the Family and by CRL, Inc., a holding company which holds title to some of the Katy stock beneficially owned by the Carroll Family.

5. The Participation Agreement generally provides that Carroll Family members: (i) will transfer shares only to a newly formed acquisition entity or to other family members; (ii) will vote in favor of a Carroll Merger and other measures to facilitate it; and (iii) will not solicit or vote in favor of any third party proposal. Kahn Aff. Ex. A at 57.

6. On September 2, 1992, six class action complaints were filed in this court, alleging that the $22.00 per share offer was grossly inadequate. These six actions were eventually consolidated along with two complaints filed earlier under the caption, *In re Katy Indus., Inc. Shareholders Litig.*, C.A. No. 12612, 1994 WL 444765 (Cons.).

7. The Special Committee included the defendants Messrs. William F. Andrews, C. Felix Harvey, Lutz Raettig, and J. Stuart Hunt, Chairman.

8. This fact is important to plaintiffs because they wish to establish that at this or some later point the "non-selling" members of the Carroll Family held less than 50% of Katy's voting stock. From this premise they then try to build an argument that "control" was at such time in the public shares and thus at the time of the March 15 acceptance by the board of the Family's $25.75 proposal, the transaction represented a change in corporate control as contemplated by *Paramount Communications Inc. v. QVC Network Inc.*, Del.Supr., 637 A.2d 34 (1993), thus, in their theory triggering "Revlon duties." It is their view of the impact here of "Revlon duties" that leads to relief they seek.

Rosecliff Pensler Partners L.P. ("Rosecliff Pensler")[9] proposed to purchase, on a friendly basis only, all of Katy's outstanding shares for at least $29.00 per share, subject to completing due diligence, obtaining financing, and receiving necessary government approvals. On September 2, Barry Carroll wrote to Mr. Saliba that he thought the Rosecliff Pensler offer was attractive and should be pursued.

At a special meeting of the board of directors of September 17, 1993, representatives of the Special Committee advised the Board that Goldman Sachs had stated, in effect, that until the Rosecliff Pensler proposal could be more clearly defined and evaluated, the Special Committee could not rely upon Goldman's August 23, 1993 opinion concerning the fairness of the Carroll Family Merger. As a result, the Special Committee advised the full board that it was not then in a position to continue its endorsement of the Carroll Family Merger. At that meeting Philip Johnson reiterated that as shareholders the members of the Carroll Family were not interested in selling their shares; there was therefore no way in which a Rosecliff Pensler merger proposal could be effectuated; and thus no reason for Katy to permit Rosecliff Pensler to conduct a due diligence investigation.

Notwithstanding Mr. Johnson's position, the Katy board resolved at a further September 23, 1993 meeting to permit Rosecliff Pensler access to Company information on the same basis as it had been made available to the Carroll Family's advisors.

## C. Steinhardt/Pensler Proposal

By mid-November 1993, Rosecliff Inc. appears to have lost interest in a Katy transaction, but Pensler found a new joint venturer in Steinhardt Enterprise Inc. On November 29, 1993, a new partnership of Pensler Capital Corporation and Steinhardt Enterprise Inc. ("Steinhardt Pensler") proposed to purchase all of Katy's outstanding shares at $28.00 per share, purportedly without financing or due diligence conditions. The offer was scheduled to expire on December 6, 1993.[10]

Also on November 29, Barry Carroll advised Mr. Saliba and the board of directors that he would not sign another extension of the Participation Agreement, scheduled to terminate on November 30, 1993, and that he intended to sell his shares pursuant to the 1983 Stock Purchase Agreement. The withdrawal of Barry Carroll's shares from the Participation Agreement left the Carroll Family, excluding Barry Carroll (hereinafter, the "Carroll Group"), with ownership of approximately 47.9% of Katy's outstanding common stock.

## D. Carroll Family Market Purchases

On December 1, 1993, Philip Johnson wrote to Mr. Saliba that the Carroll Family was exercising its right to terminate the merger agreement.[11]

Also on December 1, the Carroll Group (i.e., the family minus Barry Carroll and affiliates) filed a Schedule 13D amendment with the Securities and Exchange Commission disclosing that it intended to acquire additional shares of common stock "to establish the position of the [Carroll Group] as the holders, in the aggregate, of a majority of the outstanding Shares and thereby to assure the control of the Company by the members of the Carroll Family regardless of the level of Share holdings of Mr. Barry Carroll . . . ." Kahn Aff. Ex. F at 38. The Carroll Group further stated that it had no present intention of engaging in any transaction to take Katy private. On December 2 and 3, 1993, Wallace Carroll, Jr. and Lelia Carroll Johnson purchased shares in the market with the result that the Carroll Group's ownership

9. Rosecliff Pensler was a partnership of Rosecliff, Inc. and Pensler Capital Corporation.

10. The offer was later extended until December 9, 1993.

11. Although a hearing on a proposed settlement of the earlier stockholder class actions had been held on November 18, 1993, the termination of the merger agreement and withdrawal of the $25.75 offer rendered the proposed settlement in the consolidated action moot, and defendants' attorneys so advised this court. *See In re Katy Indus., Inc. Shareholders Litig.*, Cons. C.A. No. 12612, Docket Entry 126.

rose again to 50.6% of the outstanding common stock of Katy.

### E. Further Negotiations With Steinhardt/Pensler and the Requested Dilution of Carroll Group Control

On December 3, 1993, the Special Committee requested authority from the board to meet and negotiate with Steinhardt Pensler. After a spirited discussion during which Mr. Johnson reiterated that the Carroll Group was in no event interested in selling its Katy stock, and over the objection of certain directors, the board granted the permission requested.

On December 5, 1993, Steinhardt Pensler presented the Special Committee with a proposed Merger Agreement that contemplated a $28.00 per share cash merger and a proposed Stock Option Agreement. The Stock Option Agreement would grant Steinhardt Pensler an irrevocable option to purchase up to 1.8 million shares of authorized but unissued shares of Katy at a price equal to the merger consideration; it would also grant Steinhardt Pensler the right to put the shares to Katy if the shareholders subsequently failed to approve the merger. Both agreements would require Katy to indemnify Steinhardt Pensler and pay damages if the option was found to be improper.

On December 11, while the Special Committee and its legal and financial advisors were evaluating the offer, Steinhardt Pensler made another offer at a reduced price of $27.80, claiming that it had just learned that Goldman Sachs' fee arrangement with Katy was tied to the merger price.[12]

On December 13, the Special Committee met with Steinhardt Pensler and its advisors. Later that same day, the Special Committee reported to the full board. The board then authorized the Special Committee to continue to meet and negotiate concerning the proposed Merger and Stock Option Agreements with Steinhardt Pensler. Mr. Johnson voiced the Carroll Group's objection to the dilutive option in strong terms, claiming it would constitute a breach of fiduciary duty to the Carrolls by diluting their controlling position just to favor others.

The Special Committee sent a revised draft of the proposed agreements to Steinhardt Pensler on December 14. The proposed changes included provisions: insuring that Steinhardt Pensler had the financial commitments necessary to close the deal; prohibiting Steinhardt Pensler from further altering or withdrawing from the transaction based on due diligence; and imposing further conditions on the receipt of termination and breakup fees. There was no timely response and, by its terms, the $27.80 Steinhardt Pensler offer expired on December 15, 1993.

Nevertheless, the two sides' representatives remained in contact regarding Steinhardt Pensler's financing and other matters through December 1993 and early January 1994.[13] On January 18, 1994, the Special Committee reported to the full board that a "log jam" in negotiations with Steinhardt Pensler over the bidders' financing had broken when the Special Committee received letters, and Goldman Sachs confirmed, that the partners had access to capital sufficient for the commitment. Minor points arising from due diligence required further negotiation. The purchase price remained $27.80, but would rise to $28.00 if Goldman Sachs would cap its fee at $1 million. The legality of the grant of the dilutive option continued to be a crucial issue to the Special Committee. At the January 18 meeting, the board

---

**12.** Under the terms of the Engagement Letter of February 24, 1993, between Goldman Sachs and Katy as described in the August 23, 1993 proxy statement, Goldman Sachs was entitled to approximately $1 million (of which $500,000 had already been paid to the bank at the termination of an earlier engagement letter) plus expenses and costs. Kahn Aff. Ex. A at 26. Steinhardt Pensler claimed it had been unaware that the fee structure was incentive-based, and that its offer, if consummated, would generate fees of about $1.7 million.

Steinhardt Pensler offered to increase the bid to $28.00 per share if Goldman Sachs agreed to cap its fee at $1 million, and stated that the new offer would expire on December 15, 1993. Odoner Aff. ¶ 4.

**13.** During this period, Mr. Philip Johnson wrote to Mr. Flanagan, counsel to the Special Committee, to express the Carroll Group's position that it would sue to prevent the issuance of a dilutive option. Kahn Aff. Ex. G, Tab 28 at 2.

unanimously agreed, though it did not formally resolve that, without an opinion from the Special Committee's Delaware counsel, to the effect that the option would be valid and would not constitute a breach of duty, the Committee could not negotiate a merger agreement including such an option with Steinhardt Pensler.

### F. Legal Opinions on the Dilutive Option

The Special Committee had retained Delaware counsel in connection with defense of the early stockholder actions. *See supra* n. 6. The Special Committee now turned to that counsel for advice on the question whether granting an option of the type sought would, in the circumstances, constitute a violation of the board's fiduciary duty to the Carroll Group as shareholders. The Special Committee's Delaware attorneys produced a thirty-two-page opinion analyzing the relevant facts and law, and essentially concluded that it was unclear whether granting the option would be legal.

Following the receipt of the inconclusive opinion of its counsel, the Special Committee made two recommendations at a January 28, 1994 special meeting of the full board. Given the uncertain validity of the option, the Special Committee first recommended that it was no longer in the best interests of Katy and its shareholders to pursue negotiations with Steinhardt Pensler. Second, the Special Committee recommended that the board appoint another committee to explore other methods to maximize shareholder value, including: (i) a self-tender by Katy; (ii) a Dutch auction of Katy shares; and/or (iii) a dividend in excess of $10.00 per share on Katy's common stock. In accordance with these recommendations, the board directed the Special Committee's counsel to notify Steinhardt Pensler that Katy would no longer discuss a merger with a dilutive option. The board further established a new committee to consider strategies to enhance shareholder value.

On March 8, 1994, the new committee recommended that the board approve a special cash dividend of $14.00 per share of Katy common stock. The board has endorsed that recommendation but has not yet declared such a dividend, pending outcome of this motion. This suit had been filed on February 18, 1994 and on March 17, 1994 the court heard plaintiffs' motion for preliminary injunction.

### II.

■ The issuance of any form of equitable relief requires the exercise of judicial discretion informed by the particular facts and circumstances present. A structure for the exercise of that judgment has long existed. It requires, first, that plaintiffs persuade the court that they have a reasonable likelihood of prevailing on the merits of the complaint at trial. If that demonstration is made, the court must then inquire whether plaintiffs are threatened with irreparable injury before a final hearing may be had. Finally, the court must balance against that threat, the harm that may befall the defendant (or others with a legitimate interest in the matter), should the remedy be granted improvidently. *See Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1341 (1987); *QVC Network, Inc. v. Paramount Communications, Inc.*, Del.Ch., 635 A.2d 1245, 1261, *aff'd*, Del.Supr., 637 A.2d 34 (1994). When the request is for a mandatory order, the required showing on the merits may be greater. *See, e.g., Steiner v. Simmons*, Del. Supr., 111 A.2d 574 (1955); *Nomad Acquisition Corp. v. Damon Corp.*, Del.Ch., C.A. No. 10173, Hartnett, V.C., slip op. at 11, 1988 WL 383667 (Sept. 20, 1988).

I conclude for the reasons that follow that plaintiffs have not demonstrated a reasonable likelihood of success at this time on the claim that they urge on this motion.

### III.

Plaintiffs' principal theory in support of its request for a preliminary injunction is, as noted above, that the Katy board's decision to accept the Carroll Family Merger proposal invoked what plaintiffs and others have called "Revlon duties," and that this special state places on the board an obligation to maximize the current value of shares, which can only be done here by facilitating accep-

tance of the "higher" Pensler offer. Since this can only be done by diluting the ownership block of the Carroll Family, according to plaintiffs, the board's "Revlon duty" requires it to do so.

A number of subsidiary questions are raised which my analysis allows me to pass over for the present. For example, plaintiffs place emphasis upon the question whether the Carroll Group owned about 48% or 50% of Katy's common stock at various moments. In their analysis, "Revlon duties" attach when a transaction contemplates a transfer of a majority of outstanding shares; therefore plaintiffs attempt to show that Carroll Family or Carroll Group ownership fell below that level at certain points. In this respect, however, the analysis plaintiffs officer is formalistic. It is uncontested that given the distribution of stock ownership in this company, that the Carroll Family and Carroll Group, however configured, in fact had the effective power, acting in concert, to control the outcome of any stockholder election. As set forth below, this undisputed fact, and the consequences that flow from it in financial markets that price securities, is the vital premise of my decision.

## IV.

■ I turn then to the core issue: whether Katy's board of directors has or had a legal or equitable obligation to facilitate a closing of Pensler's $27.80 cash merger proposal by granting the option that Pensler seeks. To provide an answer to such a question, particularly in the setting of a preliminary injunction application, does not require one to formulate an answer to the abstract question whether a board of directors could ever, consistent with its fiduciary obligations, grant an option to buy stock for the principal purpose of affecting the outcome of an expected shareholder action, such as an election, a consent solicitation, or a tender offer. Surely if the principal motivation for such dilution is simply to maintain corporate control ("entrenchment") it would violate the norm of loyalty. *See Condec Corp. v. Lunkenheimer*

*Co.*, Del.Ch., 230 A.2d 769 (1967); *Canada Southern Oils, Ltd. v. Manabi Exploration Co.*, Del.Ch., 96 A.2d 810 (1953). Where, however, a board of directors acts in good faith and on the reasonable belief that a controlling shareholder is abusing its power and is exploiting or threatening to exploit the vulnerability of minority shareholders, I suppose, for reasons touched upon in the cases cited in the margin,[14] that the board might permissibly take such an action. *See Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985).

Here, of course, plaintiffs' core argument can be understood to be that the controlling shareholders *are* exploiting the vulnerability of the minority shares in a very particular way. The gist of plaintiffs' complaint is that the minority shareholders could get more cash for their stock in a Pensler cash deal than they would have gotten in the proposed $25.75 Carroll Group deal. Thus, plaintiffs would contend that the foregoing protective principle grounded in fiduciary obligation would apply to this situation, and that the board is, as a result, under a current obligation to take the radical step of intentionally diluting the control of the controlling block of stock.

In my opinion, this view is mistaken. I apprehend in the facts recited above no threat of exploitation or even unfairness towards a vulnerable minority that might arguably justify discrimination against a controlling block of stock. Plaintiffs see in the Carroll Group's unwillingness to sell at $27.80 or to buy at that price, a denial of plaintiffs' ability to realize such a price, and see this as exploitation or breach of duty. This view implicitly regards the $27.80 per share price and the Carroll Family Merger price of $25.75 as comparable sorts of things. But they are legally and financially quite different. *It is, for example, quite possible that the Carroll $25.75 price may have been fair, even generous, while the $27.80 Pensler price may be inadequate.* If one understands why this is so, one will understand

**14.** *See Blasius Indus., Inc. v. Atlas Corp.*, Del.Ch., 564 A.2d 651 (1988); *Freedman v. Restaurant Assoc.*, Del.Ch., C.A. No. 9212, 1987 WL 14323, Allen, C. (Oct. 16, 1987); *Phillips v. Insituform of North America, Inc.*, Del.Ch., C.A. No. 9173, 1987 WL 16285, Allen, C. (Aug. 27, 1987).

one reason why the injunction now sought cannot be granted.

The fundamental difference between these two possible transactions arises from the fact that the Carroll Family already in fact had a committed block of controlling stock. Financial markets in widely traded corporate stock accord a premium to a block of stock that can assure corporate control. Analysts differ as to the source of any such premium but not on its existence. Optimists see the control premium as a reflection of the efficiency enhancing changes that the buyer of control is planning on making to the organization.[15] Others tend to see it, at least sometimes, as the price that a prospective wrongdoer is willing to pay in order to put himself in the position to exploit vulnerable others,[16] or simply as a function of a downward sloping demand curve demonstrating investors' heterogeneous beliefs about the subject stock's value.[17] In all events, it is widely understood that buyers of corporate control will be required to pay a premium above the market price for the company's traded securities.

The law has acknowledged, albeit in a guarded and complex way, the legitimacy of the acceptance by controlling shareholders of a control premium. *See Cheff v. Mathes,* Del.Supr., 199 A.2d 548, 555 (1964); *Hecco Ventures v. Sea–Land Corp.,* Del.Ch., C.A. No. 8486, 1986 WL 5840, Jacobs, V.C. (May 19, 1986); *Zetlin v. Hanson Holdings, Inc.,* 48 N.Y.2d 684, 421 N.Y.S.2d 877, 878, 397 N.E.2d 387, 388–89 (1979).[18]

The significant fact is that in the Carroll Family Merger, the buyers were not buying corporate control. With either 48% or 52% of the outstanding stock they already had it. Therefore, in evaluating the fairness of the Carroll proposal, the Special Committee and its financial advisors were in a distinctly different position than would be a seller in a transaction in which corporate control was to pass.

The Pensler offer, of course, was fundamentally different. It was an offer, in effect, to the controlling shareholder to purchase corporate control, and to all public shareholders, to purchase the remaining part of the company's shares, all at a single price. It distributed the control premium evenly over all shares. Because the Pensler proposed $27.80 price was a price that contemplated not simply the purchase of non-controlling stock, as did the Carroll Family Merger, but complete control over the corporation, it was not fairly comparable to the per-share price proposed by the Carroll Group.

\*        \*        \*

To note that these proposals are fundamentally different does not, of course, mean that the board owes fiduciary duties in one instance but not in the other. That is not the case. But to describe the duty that corporate directors bear in any particular situation one must first consider the circumstances that give rise to the occasion for judgment. When the Katy board or its Special Committee evaluated the Carroll Family Merger, it was obligated to take note of the circum-

**15.** Frank H. Easterbrook and Daniel R. Fischel, *The Economic Structure of Corporate Law* 126–44 (1991); Frank H. Easterbrook and Daniel R. Fischel, *Corporate Control Transactions,* 91 Yale L.J. 698 (1982).

**16.** *See* Robert W. Hamilton, *Private Sale of Control Transactions: Where We Stand Today,* 36 Case W.Res.L.Rev. 248 (1985); *see, e.g., Gerdes v. Reynolds,* 28 N.Y.S.2d 622, 650–52 (N.Y.App.Div. 1941).

**17.** *See* Lynn A. Stout, *Are Takeover Premiums Really Premiums? Market Price, Fair Value, and Corporate Law,* 99 Yale L.J. 1235, 1244–52 (1990).

**18.** The doctrine applicable to a sale of corporate control at a premium is far more complex than it

may at first appear. Indeed one might conclude that courts afford it somewhat grudging recognition. A number of liability creating doctrines have been applied which have the effect of creating risks to the controlling shareholder who attempts to realize a control premium. These doctrines include negligence, *see Harris v. Carter,* Del.Ch., 582 A.2d 222, 232–36 (1990); *Insuranshares Corp. v. Northern Fiscal Corp.,* 35 F.Supp. 22, 25–27 (E.D.Pa.1940); sale of corporate office, *see Essex Universal Corp. v. Yates,* 305 F.2d 572, 581–82 (2d Cir.1962) (Friendly, J., concurring); and sale of corporate opportunity, *see Brown v. Halbert,* 271 Cal.App.2d 252, 76 Cal. Rptr. 781, 791–94 (1969); *Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 81 Cal.Rptr. 592, 604, 460 P.2d 464, 476 (1969). *See generally* E. Elhauge, *The Triggering Function of Sale of Control Doctrine,* 59 U.Chi.L.Rev. 1465 (1992).

stance that the proposal was being advanced by a group of shareholders that constituted approximately 50% of all share ownership, and who arguably had the power to elect the board. In this circumstance, in my opinion, the board's duty was to respect the rights of the Carroll Family, while assuring that if any transaction of the type proposed was to be accomplished, it would be accomplished only on terms that were fair to the public shareholders and represented the best available terms from their point of view. *See, e.g., Kahn v. Lynch Communication Sys., Inc.,* Del.Supr., 638 A.2d 1110, 1119 (1994); *In re First Boston, Inc. Shareholders Litig.,* Del. Ch., C.A. No. 10338 (Cons.), 1990 WL 78836, Allen, C. (June 7, 1990).

This obligation the board faces is rather similar to the obligation that the board assumes when it bears what have been called "Revlon duties," but the obligations are not identical. When presented with the controlling stockholders' proposal, the obligation of the Katy board was in some respects similar to that faced by a board when it elects to sell the corporation, because *if* the board were to approve a proposed cash-out merger, it would have to bear in mind that the transaction is a final-stage transaction for the public shareholders. Thus, the time frame for analysis, insofar as those shareholders are concerned, is immediate value maximization. The directors are obliged in such a situation to try, within their fiduciary obligation, to maximize the current value of the minority shares. In this respect the obligation is analogous to the board's duty when it is engaged in a process of "selling" the corporation, as for example in the recent *Paramount Communications Inc. v. QVC Network Inc.,* Del. Supr., 637 A.2d 34 (1994). But the duty is somewhat different because of the existence of the controlling Carroll Family block.

The Carroll Family made it clear throughout these events that, for the most part, its members were completely uninterested in being sellers in any transaction.[19] No part of

their fiduciary duty as controlling shareholders requires them to sell their interest. *See Bershad v. Curtiss–Wright Corp.,* Del.Supr., 535 A.2d 840 (1987); *Jedwab v. MGM Grand Hotels, Inc.,* Del.Ch., 509 A.2d 584 (1986) (self sacrifice not required). The board's fiduciary obligation to the corporation and its shareholders, in this setting, requires it to be a protective guardian of the rightful interest of the public shareholders. But while that obligation may authorize the board to take extraordinary steps to protect the minority from plain overreaching, it does not authorize the board to deploy corporate power *against* the majority stockholders, in the absence of a threatened serious breach of fiduciary duty by the controlling stock.

To acknowledge that the Carroll Family has no obligation to support a transaction in which they would in effect sell their stock is not, of course, to suggest that they can use their control over the corporation to effectuate a self-interested merger at an unfair price. *See Weinberger v. U.O.P., Inc.,* Del. Supr., 457 A.2d 701 (1983). There is nothing in the present record, however, that suggests to me that the $25.75 price the Carroll Group proposed to pay for the public shares was an inadequate or unfair price for the non-controlling stock. For the reasons stated above, the fact that Pensler was willing to pay more for all of the shares does not, logically, support an inference that the Carroll proposal for the non-controlling public shares was not fair.

Thus, while I continue to hold open the possibility that a situation might arise in which a board could, consistently with its fiduciary duties, issue a dilutive option in order to protect the corporation or its minority shareholders from exploitation by a controlling shareholder who was in the process or threatening to violate his fiduciary duties to the corporation,[20] such a situation does not at all appear to have been faced by the Katy board of directors.

---

19. The fact that Mr. Barry Carroll parted company with his family does not appear to have affected the practical fact of control—which of course is the predicate fact for the existence of a control premium.

20. In such an instance the board would bear a heavy burden to establish the justification for any steps purposely taken to affect the outcome of shareholder action. *See Blasius Indus., Inc. v. Atlas Corp.,* Del.Ch., 564 A.2d 651 (1988).

In my opinion, far from "Revlon duties" requiring such action, the Katy board could not, consistent with its fiduciary obligations to all of the stockholders of Katy Industries, have issued the dilutive option for the purpose sought in this instance. Therefore, that the board considered the matter and declined to do so could in no event be considered to constitute a breach of duty to the minority shareholders.

### V.

The Carroll Group withdrew its proposed merger on December 1, 1993. Thereafter, on March 8, 1994, the board authorized the payment of an extraordinary $14.00 per share cash dividend. Plaintiffs seek to enjoin the payment of this dividend.

It is elementary that the declaration of dividends out of available corporate funds is a matter left to the discretion of the board of directors and that the declaration or payment of a dividend will be reviewed by a court only on the basis of fraud or gross abuse of discretion. *See Gabelli & Co. v. Liggett Group, Inc.*, Del.Supr., 479 A.2d 276, 280 (1984) (quoting *Eshleman v. Keenan*, Del.Ch., 194 A. 40, 43 (1937) (Wolcott, C.)).

The only argument plaintiffs can advance in support of the position that the declaration and payment of the special dividend is "a gross abuse," is again predicated upon the assertion that "Revlon duties" require the board now to maximize the current value of the stock. The proposed dividend, they say, is inconsistent with a transaction with Pensler, and thus does not satisfy this Revlon duty. Concluding as I do above, it follows that plaintiffs have shown no gross abuse in the declaration of the special dividend, nor have plaintiffs shown any other ground for the grant of preliminary injunction at this time. Therefore the application will be denied.

**It is so ordered.**