Conrad M. BLACK, Hollinger Inc., and 504468 N.B. Inc., Defendants and Counterclaim Plaintiffs Below, Appellants, Cross–Appellees,

v.

HOLLINGER INTERNATIONAL INC., et al., Plaintiff and Counterclaim Defendants Below, Appellees, Cross–Appellant.

Conrad M. Black, Defendant and Counterclaim Plaintiff Below, Appellant,

v.

Hollinger International Inc., et al., Plaintiff and Counterclaim Defendants Below, Appellees.

Conrad M. Black, Hollinger Inc., and 504468 N.B. Inc., Defendants Below, Appellants.

v.

Hollinger International Inc., et al., Plaintiff and Counterclaim Defendants Below, Appellees.

Nos. 130,2004, 292,2004, 304,2004.

Supreme Court of Delaware.

Submitted: Dec. 15, 2004.
Decided: April 19, 2005.

Jesse A. Finkelstein, Raymond J. Di-Camillo and Candice M. Toll, Esquires, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Jeffrey A. Lamken (argued) and Alexandra Walsh, Esquires, of Baker Botts L.L.P., Washington, D.C.; John L. Warden, David H. Braff, James V. Masella, III, and Laurent S. Wiesel, Esquires, of Sullivan & Cromwell LLP, New York, New York; Attorneys for Defendant Below/Appellant Conrad M. Black.

A. Gilchrist Sparks, III, Kenneth J. Nachbar and Megan Ward Cascio, Esquires, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Nathan P. Eimer, David M. Stahl (argued), Andrew G. Klevorn and Vanessa G. Jacobsen, Esquires, of Eimer Stahl Klevorn & Solberg LLP, Chicago, Illinois, Attorneys for Defendants Below/Appellants Hollinger Inc. and 504468 N.B. Inc.

Lawrence C. Ashby, Philip Trainer and Richard L. Renck, Esquires, of Ashby & Geddes, Wilmington, Delaware; Of Counsel: Jonathan Rosenberg, Esquire, of O'Melveny & Myers LLP, New York, New York; Henry C. Thumann and Ian Simmons, Esquires, of O'Melveny & Myers, Washington, D.C.; Attorneys for Counterclaim Defendants Below/Appellees Gordon A. Paris, Graham W. Savage and Raymond G.H. Seitz.

Collins J. Seitz, Jr. and Samuel D. Brickley II, Esquires of Connolly Bove Lodge & Hutz, Wilmington, Delaware; Of Counsel: Thomas J. Kavaler, Robert A. Alessi and Hilary S. Steuer, Esquires, of Cahill Gordon & Reindel LLP, New York, New York; Attorneys for Counterclaim Defendants and Appellees Richard C. Breeden and Richard C. Breeden & Co., LLC.

Edward P. McNally and Linda Martin Gilchrist, Esquires of Morris, James, Hitchens & Williams, Wilmington, Delaware; Attorneys for Counterclaim Defendants Below/Appellees Richard R. Burt and Henry A. Kissinger.

David C. McBride, Bruce L. Silverstein, Rolin P. Bissell, Christian Douglas Wright and Karen E. Keller, Esquires, of Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware; Of Counsel: Martin Flumenbaum (argued) and Robert A. Atkins, Esquires, of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; Attorneys for Plaintiff and Counterclaim Defendant Below/Appellee, Cross–Appellant Hollinger International, Inc. and Counterclaim Defendants Below/Appellees James R. Thompson, Richard N. Perle and Shmuel Meitar.

Before STEELE, Chief Justice, HOLLAND and JACOBS, Justices.

PER CURIAM.

Pending before this Court are an appeal and cross-appeal from a final judgment of the Court of Chancery awarding injunctive, declaratory and money damages relief against Hollinger Inc. ("Inc.") and Inc.'s ultimate controlling stockholder, Lord Conrad M. Black ("Black"). The judgment was awarded in favor of Hollinger International Inc. ("International" or "the Company"). We find no error of fact or law and, therefore, affirm.

## Background Facts [1]

To aid in understanding the issues presented on this appeal, the background facts and history of this litigation are first set forth. International is a Delaware publicly-held corporation controlled by Inc.[2] Besides being International's controlling stockholder (through intermediate holding companies), Black was also the Company's Chief Executive Officer and Chairman. In May 2003, one of International's largest stockholders demanded that International's board of directors investigate the payment of over $70 million to Black and other International executives, purportedly made in connection with covenants not to compete. It was claimed that those payments violated the executives' duty of loyalty owed to International. In response to that demand, the International board formed a Special Committee with the mandate and power to investigate and (if believed warranted) to prosecute litigation on behalf of International. As a result of its investigation, the Special Committee identified potential improprieties relating to both the purported non-competition payments and the disclosures in the company's annual reports relating to those transactions.[3] The Special Committee brought its preliminary findings to the Audit Committee, to enable the two committees to confer on what should be done. The result was a letter sent by the chairs of both committees to all executives who had received the questioned payments, asking the recipients to detail the circumstances, and to furnish evidence, of the approval of each non-compete payment.

Aware of his vulnerability to a full-blown investigation not only from the Special Committee but also from the United States Securities and Exchange Commission (SEC), and faced with findings of improper self-dealing and material misrepresentations in International's public filings, Black entered into a "Restructuring Proposal" Agreement with the Company. As part of that Agreement, Black agreed to, among other things: resign as CEO, repay the non-compete payments and cause Inc. to do likewise, accede to a reconstituted board that would have a solid majority of independent directors, and not interfere with the on-going Special Committee investigation. Black also agreed to devote his principal time and energy to a "Strategic Process" that would involve the development of a value-maximizing transaction for the Company, such as a sale of the entire Company or some of its assets. The Restructuring Proposal Agreement was publicly announced in November 2003.

**1.** The adjudicated facts and legal rulings are found in the Court of Chancery opinion granting declaratory and injunctive relief to International, *Hollinger Intern., Inc. v. Black*, 844 A.2d 1022 (Del.Ch.2004); and the transcript of that Court's bench ruling granting International's motion for summary judgment as to liability and damages, *Hollinger International Inc. v. Black*, C.A. No. 183–N, (Del.Ch., May 19, 2004) (Transcript). The presentation of the adjudicated facts in this Opinion is abbreviated. A complete recitation of the facts is found in the above-cited opinion and transcript ruling.

**2.** Inc. is a holding company whose principal asset is ownership of almost 15 million shares of Class B common stock of International, representing 30.3% of International's equity and 72.8% of its voting power. Black controls International through The Ravelston Corporation, a company wholly owned by him. Ravelston, in turn, owns approximately 78% of Inc.'s common stock.

**3.** The Special Committee found no evidence that any non-competition agreements were ever entered into, or approved by, International's Audit Committee or its board of directors. The Special Committee was also concerned that the annual report disclosures were false and needed immediate correction.

Almost immediately after the Restructuring Proposal Agreement was announced, Black violated it. Black did so by diverting to himself a valuable opportunity that had been presented to International—the possible sale of one of its flagship businesses (*The Daily Telegraph*) or of the Company as a whole—to Frederick and David Barclay (the "Barclays"), two English brothers whose corporations owned assets that included media firms in the UK and Europe. The Barclays had first approached Black about such a sale in his capacity as the Company's CEO and Chairman. But, in a deliberate effort to "steer[ ] the Barclays toward doing an end-run around the Strategic Process,"[4] Black counter-proposed, and then negotiated with, the Barclays, to purchase Black's own controlling interest in Inc., which represented voting control of International. In connection with that diversion of opportunity, Black used confidential, non-public information of the Company for his own purposes without permission. He also gave the International board false and misleading assurances that he was not violating the Restructuring Proposal Agreement by arranging a deal involving the sale of Inc. Later, Black further violated the Restructuring Proposal Agreement by invoking his Fifth Amendment privilege against self-incrimination during an investigation by the SEC (thereby denying the SEC the benefit of International's full cooperation that was promised when the Restructuring Proposal Agreement was announced), and also by failing to repay the first 10% of the non-compete payments as he had promised.

Although Black had made every effort to conceal his dealings with the Barclays, by this point the International board suspected that Black was negotiating a transaction that would subvert the Restructuring Proposal Agreement. Accordingly, the International board, with advice of counsel, began considering various measures, including adopting a "poison pill" rights plan that would prevent Black from selling Inc. to the Barclays. Aware of the board's deliberations, Black threatened to remove the entire International board if it adopted a rights plan. He also threatened to sue the directors who served on the Company's Special Committee and on its Audit Committee.

On January 16, 2004, the Special Committee caused a lawsuit to be brought against Black and others, claiming they had engaged in improper self-dealing. The following day, International's Executive Committee met and voted to remove Black as Chairman. The reasons (as disclosed by the minutes of that meeting) were that Black had refused to cooperate with the SEC, had violated the Restructuring Proposal Agreement, and had engaged in other breaches of fiduciary duty not related to the non-compete payments.

Thereafter, on January 17, 2004, Black faxed a letter formally advising the Company of his intent to enter into the "Barclays transaction," in which the Barclays would purchase all the equity of Inc. and would redeem certain of its preference shares. Black and his holding companies agreed to support the transaction. That same day, Black sent a letter to the International board repudiating the Restructuring Proposal Agreement, claiming (falsely) that at the time he signed the Restructuring Proposal Agreement he did not have access to evidence that the non-competes may have been properly authorized, but that he now possessed such evidence.

In response to these events, the International board met on January 20, 2004 and formed a Corporate Review Committee

---

4. 844 A.2d at 1045.

("CRC") composed of all directors other than Black, Mrs. Black and another director (Colson) who was allied with Black. The CRC was given broad authority to act for the Company, including authority to adopt measures such as a stockholder rights plan, to initiate litigation, and to cooperate with governmental investigations.

In response to these actions, Black caused Inc. to file a written consent that amended the bylaws of International (the "ByLaw Amendments"), to require: (1) seven days' written notice to all directors of any meeting of the International board; (2) in any notice of a special meeting of the board, disclosure of all business to be conducted at the meeting; (3) at least 24 hours written notice to all directors of any committee meetings; (4) within five days of the meeting, a report to the full board of the substance of all actions taken at committee meetings; (5) the presence of at least 80% of the directors at any board meeting in order to constitute a quorum for most business; (6) the presence of all directors to constitute a quorum for the International board to take action on certain "Special Board Matters," which included changing the number of directors, filling a vacancy on the board, approving a merger or selling all or substantially all of the Company's assets or selling assets having a value of more than $1 million, and amending or repealing any by-law; (7) the unanimous assent of all directors to approve any Special Board Matter or to establish new committees; and (8) the dissolution of all committees of the board (including the CRC) except for the Audit and Special Committees, and rescinding all added authority given to the Special Committee in the January 20 Board resolution.

The ByLaw Amendments, if valid, would have the effect of empowering Black unilaterally to block any material sale of as-

sets, to prevent the signing of a merger agreement, and to disable the International board from adopting a shareholder rights plan. International's independent directors (*i.e.*, the CRC) believed that the ByLaw Amendments were not valid and that the Barclays transaction constituted a breach by Black of the Restructuring Proposal Agreement, that would eviscerate the Strategic Process and limit the Company's freedom to consider the range of options that Agreement contemplated. Accordingly, the CRC continued to meet and, on January 25, 2004, adopted the "Rights Plan", which would make it economically impractical for the Barclays transaction to proceed unless the Barclays reached an accommodation with the International board. The CRC's purpose for adopting the Rights Plan was to restore International's negotiating authority to the level existing at the time the Restructuring Proposal Agreement was entered into; to give the board leverage to cause Black and Inc. to honor their commitments under that Agreement; and to enable the board to ensure that International shareholders other than Black and Inc. benefited fairly from any transaction involving the Company.

### The Claims Presented And The Rulings Of The Court of Chancery

Following the CRC's adoption of the Rights Plan, International brought this action against Black and Inc., for a preliminary injunction preventing the Barclays transaction and any further breaches of the Restructuring Proposal Agreement. The basis for the Company's lawsuit was that the defendants' conduct constituted breaches of fiduciary duty and breaches of contract. The Company also sought a declaration that the ByLaw Amendments were legally ineffective because (among other things) they had been adopted for an inequitable purpose. Finally, the Compa-

ny sought a determination that the Rights Plan was legally valid.

Defendants Black and Inc. opposed these claims and interposed counterclaims for an expedited declaration that the Rights Plan was invalid, and for an injunction against the implementation of the Rights Plan.[5] These claims and counterclaims were the subject of an expedited trial and preliminary injunction proceeding, that were resolved, finally and on the merits, in an opinion handed down by the Court of Chancery on February 26, 2004, and in a summary judgment bench ruling handed down on May 19, 2004. Those rulings were implemented in Orders entered on March 3, 2004 and June 28, 2004,[6] respectively, in which the Court of Chancery made the determinations, and entered judgments providing, as follows:

*First,* the Court of Chancery rejected the Company's claim that the ByLaw Amendments, insofar as they abolished the CRC and stripped it of authority, were invalid under 8 *Del. C.* § 141(c)(2). Although the Court of Chancery determined that the ByLaw Amendments were not *per se* invalid under that statute, it did hold that the ByLaw Amendments were invalid in equity and of no force and effect, because they had been adopted for an inequitable purpose and had an inequitable effect.

*Second,* the Court of Chancery determined that Black had breached his fiduciary duties during the process leading to the Barclays transaction. Specifically, the Court held that Black violated his duty of

loyalty by: (1) purposefully denying the International board its prerogative to consider fairly and responsibly a strategic opportunity within the scope of the Strategic Process (the opportunity to sell *The Telegraph* ) and by diverting that opportunity to himself; (2) misleading his fellow directors about his course of conduct and not disclosing his dealings with the Barclays, in circumstances where full disclosure was expected; (3) improperly using confidential information of International to further his own personal interests and not those of International, without the authorization of his fellow directors; and (4) urging the Barclays to make improper inducements to International's investment banker to betray its client (International) by attempting to secure the Company board's assent to the Barclays transaction.

*Third,* the Court of Chancery determined that Black had violated material provisions of the Restructuring Proposal Agreement by: (1) failing to repay the non-compete payments as the Agreement required; (2) not devoting his principal time and energy to the Strategic Process as the Agreement required; (3) entering into the Barclays transaction, which preempted International's ability to consummate a transaction as intended by paragraph 7 of that Agreement; and (4) not giving advance notice of the Barclays transaction, as required by paragraph 6 of the Agreement. The Court also held that those contractual breaches were not excused.

---

**5.** The Barclays intervened in the action and supported the positions taken by Black and Inc. with only insignificant variations.

**6.** *Hollinger International Inc. v. Black, et. al.,* 844 A.2d 1022 (Del.Ch.2004). The Court determined the validity of the Rights Plan and the invalidity of the By–Law Amendments on the merits, and the balance of the claims (and

counterclaims) preliminarily. The balance of the claims, *i.e.,* International's claims for breach of contract and fiduciary duty, was resolved finally and on the merits in a bench ruling handed down on May 19, 2004, in which the Court granted International's motion for summary judgment on those claims.

*Fourth*, the Court of Chancery rejected Black's (and Inc.'s) claim that the Rights Plan was statutorily and equitably impermissible, and determined that: (1) the Rights Plan was not inconsistent with or violative of any provision of the Delaware General Corporation Law; and (2) the Rights Plan was not equitably impermissible, because it satisfied the criteria established by this Court's decision in *Unocal Corp. v. Mesa Petroleum Co.*[7]

More specifically, the Court of Chancery found that the board reasonably perceived that the Barclays transaction posed several threats to the Company's best interests after a reasonable investigation. Primary among these was the threat that the Barclays transaction posed to the board's ability to complete the contractually bargained-for Strategic Process. The Court of Chancery also determined that the Rights Plan was not a disproportionate response to that threat. That Court observed that the replacement of a subsidiary's controlling stockholder with a different controlling stockholder in a transaction at the parent level should ordinarily pose no cognizable threat to the subsidiary, but the Court also observed that that is not always the case. As the Vice Chancellor noted, the Court of Chancery has recognized that in extraordinary circumstances a subsidiary may be legitimately entitled to contest a parent company's sale of its control position, even by taking action that could dilute the parent's control position. One such circumstance might be where the "controlling stockholder...was in the process or threatening to violate his fiduciary duties to the corporation."[8]

Here, the Court of Chancery found that the Rights Plan was not disproportionate to the threat, because if concrete action to dilute majority control might be justified, then so might be the far less extreme act of interposing a rights plan that only threatened such a dilution. The Rights Plan was found to be justified in this case because of the extraordinary threat presented, and because the duration of the Plan's use would be time-limited; that is, the Rights Plan would be needed only until the board was able to complete the Strategic Process and to develop its preferred option. Lastly, the Court of Chancery found that the Rights Plan was the most narrowly tailored remedy for Black's misconduct, because it would flexibly police the Restructuring Proposal Agreement while allowing Inc. to demand redemption at a later time.[9]

*Fifth*, as a consequence of these determinations, the Court of Chancery: (1) entered a money judgment in favor of International, and against Black, for $8,693,053.66, plus interest; (2) entered a money judgment in favor of International, and against Black and Inc. jointly, for $21,154,025.92, plus interest; and (3) permanently enjoined Black and all persons or entities acting in concert with him, from consummating a transaction in violation of the Restructuring Proposal Agreement, from committing further breaches of that Agreement and breaches of fiduciary duty in connection with the Strategic Process, and also from tortiously interfering with the Restructuring Proposal Agreement.[10]

7. 493 A.2d 946 (Del.1985).

8. *Hollinger*, 844 A.2d at 1088 (quoting *Mendel v. Carroll*, 651 A.2d 297, 306 (Del.Ch.1994)).

9. The Court of Chancery rejected Black's contention that the validity of the Rights Plan must be reviewed under the "compelling jus-

tification" standard established in *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651 (Del.Ch. 1988), because the Rights Plan did not affect Inc.'s voting rights in any novel or material way.

10. The Court of Chancery also dismissed Black's and Inc.'s counterclaims, including

### The Claims Advanced on This Appeal And This Court's Resolution of Those Claims

The claims advanced on this appeal (and cross appeal) center around three broad challenges. First, the appellants challenge the money judgment entered against Black and Inc., based upon adjudicated breaches of fiduciary duty and contract. Second, the appellants attack the Court of Chancery's determination that the By–Law Amendments were invalid on equitable grounds. Third, the appellants challenge the Court's determination that the Rights Plan was statutorily and equitably valid in these specific circumstances.

■ Black and Inc. first challenge the money judgments against them, all based upon the Court of Chancery's summary judgment rulings, on several grounds. Inc. claims that: (i) it was not a party to or bound by the Restructuring Proposal Agreement; (ii) it had no fiduciary or contractual duty to support the Strategic Process; and (iii) and even if Inc. had such a duty, there is no evidence to support a conclusion that Inc. breached any contractual or fiduciary obligation. Black claims that the Court of Chancery erred in holding that he had breached the Restructuring Proposal Agreement and his fiduciary duty of loyalty owed to International, because: (i) International did not have a legally protected interest in the sale of *The Telegraph*; (ii) Black did not violate any disclosure duty or duty of confidentiality owed to International, nor did he violate any fiduciary obligation by pursuing the Barclays transaction on behalf of Inc.; (iii) the Court of Chancery improperly estopped Black from relitigating his defenses to the breach of contract claims, and also erroneously excluded probative evidence that was favorable to Black; and (iv) Black cannot be held liable for monetary damages because the Company did not request such relief and, in any event, Black cannot be held liable for Inc.'s money obligation.

International, together with appellees James R. Thompson, Richard N. Perle, and Shmuel Meitan, vigorously contests these arguments. They urge that the money judgments against Inc. and Black are correct in all respects, legally, factually and procedurally, and should be affirmed.[11]

their claims against the individual members of the International board of directors. Although Black and Inc. have appealed from the judgment(s), they advance no claim or argument in their briefs that the dismissal of their claims against certain individual defendants was legally incorrect. Accordingly, to the extent their appeal purports to challenge that portion of the Final Order and Judgment dismissing Black's and Inc.'s counterclaims against counterclaim defendants Gordon E. Paris, Graham W. Savage, Raymond G.H. Seitz, Richard C. Breeden, Richard C. Breeden & Co., Inc., Richard R. Burt and Henry A. Kissinger, that challenge is deemed to have been abandoned, and the claims against those persons are not further discussed in this Opinion.

11. More specifically, the appellees contend that: (i) Inc. waived in the Court of Chancery any defense that it had not breached the Re-structuring Proposal Agreement; (ii) apart from waiver, there were no disputed issues of material fact and that based upon the undisputed facts, Inc. was obligated under the Restructuring Proposal Agreement, because Black had authority to, and did, sign that Agreement on Inc.'s behalf, thereby obligating Inc. to repay International; (iii) a money judgment was properly entered against Inc., even though International's complaint did not specifically request such relief; (iv) the Court of Chancery correctly found that Black had breached his fiduciary duties of confidentiality and of loyalty owed to International, and that Black had usurped a corporate opportunity; and (v) the Court of Chancery properly held Black monetarily liable for breach of contract, both individually and jointly with Inc. The appellees also urge that the Court of Chancery correctly determined that Black was estopped from arguing that he was entitled to relitigate his defenses against the con-

■ Second, Inc. and Black challenge the Court of Chancery's determination that the By–Law Amendments were invalid in equity. They argue that contrary to the Court's findings, those Amendments were not adopted for an inequitable purpose, nor did they have an inequitable effect. In response, the appellees contend that the Court of Chancery's invalidation of the By–Law Amendments on equitable grounds was legally and factually correct. They further argue (in their cross appeal) that should this Court rule that the Court of Chancery erred by invalidating the By–Law Amendments on equitable grounds, those Amendments must be invalidated (contrary to the Court's determination) on the alternative basis that the By–Law Amendments violate the Delaware General Corporation Law.

■ Third, Black and Inc. claim that the Court of Chancery erred in upholding the Rights Plan. They claim that the Rights Plan is statutorily invalid under 8 *Del. C.* §§ 157 and 203; and in any event, is equitably invalid under *Unocal*[12] and *Blasius*.[13] The appellees argue, in response, that the Court of Chancery correctly held that the Rights Plan was not statutorily invalid; that the Rights Plan satisfied the "threat" and "proportionality" standards of *Unocal;* that the *Blasius* standard of review did not apply; and that even if *Blasius* did apply, a sufficiently compelling jus-

tification existed for any incidental burden on Inc.'s voting rights.

We have considered carefully, and in depth, the multitudinous arguments advanced by the parties in their extensive briefs on their appeal and cross-appeal. We conclude that the Court of Chancery did not err in any respect in its findings of fact or its conclusions of law. To the extent the Court of Chancery made findings of fact, those findings are amply supported by the evidentiary record and are the result of a logical and orderly deductive process.[14] To the extent the Court of Chancery made determinations of law that were based upon those findings, and that were essential to resolving the claims and counterclaims of the parties, we find those conclusions to be free from legal error. The rationale for the rulings of the Court of Chancery are set forth in its extensive Opinion of February 26, 2004[15] and its bench ruling, and no useful purpose is served by further discussing those rulings in a separate opinion. We therefore uphold the judgment(s) on the basis of the Court of Chancery's well-reasoned Opinion and bench ruling. Our affirmance of those judgments, however, should not be viewed as approval or disapproval of statements that are *dictum, i.e.,* rulings that were not essential to a resolution of the claims before the Court of Chancery and to the award of the judgment(s) affirmed by this Court.[16]

tract claims after having fully and fairly litigated those issues at trial; and that the award of money damages against Black was within the scope, and a proper exercise, of the Court's equitable powers.

12. *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.1985).

13. *Blasius Indus., Inc. v. Atlas Corp.,* 564 A.2d 651 (Del.Ch.1988).

14. *Downs v. State,* 570 A.2d 1142, 1144 (Del. 1990).

15. *Hollinger International Inc. v. Black,* 844 A.2d 1022 (Del.Ch.2004).

16. By way of specific example, we uphold the conclusion of the Court of Chancery that the Rights Plan was valid statutorily and satisfied the requirements of *Unocal.* We express no view, however, of the Court's alternative ruling that even if *Blasius* were applicable, the Rights Plan passed muster under that standard of review. Moreover, our upholding the adoption of the Rights Plan should be understood as limited to the specific, rather extreme, circumstances of this case. It should

### Conclusion

For the foregoing reasons, the judgments of the Court of Chancery are affirmed.

not be viewed as creating any broad exception to the transaction paradigm in which rights plans are normally designed to operate: settings involving a change of control transaction at the level of the corporate entity whose board of directors adopts the rights plan.