# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE STRAIGHT PATH     )
COMMUNICATIONS INC.     )    C.A. No. 2017-0486-SG
CONSOLIDATED STOCKHOLDER     )
LITIGATION     )

## MEMORANDUM OPINION

Date Submitted: March 2, 2018
Date Decided: June 25, 2018

Ned Weinberger and Thomas Curry, of LABATON SUCHAROW LLP, Wilmington, Delaware; OF COUNSEL: Mark Lebovitch, Edward Timlin, John Vielandi, and David MacIsaac, of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Vincent R. Cappucci and Joshua K. Porter, of ENTWISTLE & CAPPUCCI LLP, New York, New York, *Attorneys for Plaintiffs JDS1, LLC and The Arbitrage Fund*.

Rudolf Koch, Kevin M. Gallagher, Sarah A. Clark, and Anthony M. Calvano, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: William Ohlemeyer, Edward Normand, and Jason Cyrulnik, of BOIES SCHILLER FLEXNER LLP, Armonk, New York, *Attorneys for Defendants IDT Corporation, Howard Jonas, and The Patrick Henry Trust*.

Kevin G. Abrams, Michael A. Barlow, and April M. Kirby, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: Greg A. Danilow, Seth Goodchild, and Thomas G. James, of WEIL, GOTSHAL & MANGES LLP, New York, New York, *Attorneys for Defendant Davidi Jonas and Nominal Defendant Straight Path Communications Inc*.

GLASSCOCK, Vice Chancellor

When the controller of a company improperly uses his control to enter a transaction with the company at the expense of the minority, the resulting cause of action for breach of fiduciary duty is an asset of the company, which stockholders typically can pursue only derivatively. When the company is sold, the litigation asset, like the other assets, passes to the purchaser. However, when a controller improperly uses her control to extract a special benefit in the sale itself, at the expense of the consideration received by stockholders in exchange for their interest in the company, the injury, and the recovery, run directly to the former stockholders; thus, they may sue directly.

This matter presents a twist on that rather simple dichotomy. Here, a holding company was for sale. It was subject to a fine which would be levied by the federal government upon sale of assets that made up the vast bulk of company value, as a percentage of the sale price. It held as an asset an indemnification right for the amount of that fine, against an entity affiliated with the controller. The outside directors were concerned that the value of the indemnification right could not be adequately monetized through the sale of the company. They were thus considering putting the indemnification claim into a litigation trust, the benefit of which would be received by stockholders—along with the consideration paid by the buyer—when the claim ripened upon the sale of the company. The stockholders' Complaint here alleges that, when the controller caught wind of the proposed litigation trust, he used

1

his control to purchase the indemnification asset instead, for a price manifestly unfair. After the sale, $614 million of the consideration was diverted to pay the fine, but the company only received $10 million (plus a portion of the proceeds from certain intellectual property-related assets) from the controller for release of the claim. The stockholders have sued the controller, and others, directly for breach of fiduciary duty.

The Defendants argue that this is a classic derivative claim; the controller allegedly purchased an asset of the company at an unfair price, that cause of action passed to the purchaser, and the claim of the former stockholders must be dismissed. I agree with the Plaintiffs, however, that under this unique factual scenario, the claim is direct. Here, the indemnification right did not fully ripen until the sale, and the leverage used by the controller included a threat to nix the transaction unless corporate assets were first transferred to his affiliates for a manifestly unfair price, but for which the consideration received by the stockholders upon sale would have included both the price paid by the purchaser and the beneficial ownership of the litigation trust. I find the transfer of the indemnification claim to the controller here to be sufficiently intertwined with the sale of the company and the assets received by stockholders therefrom to state a claim that the sales transaction was unfair. That claim is direct and may proceed.

My reasoning follows.

# I. BACKGROUND[1]

## A. Parties

Nominal Defendant Straight Path Communications Inc. is a Delaware corporation headquartered in Glen Allen, Virginia.[2] Straight Path owns two subsidiaries: (i) Straight Path Spectrum, Inc., which holds fixed wireless spectrum through its wholly owned subsidiary Straight Path Spectrum, LLC, and (ii) Straight Path IP Group, which owns a majority stake in intellectual property related to internet communications.[3] When the Complaint in this action was filed, Straight Path's securities traded on the New York Stock Exchange under the ticker symbol "STRP."[4]

Defendant IDT Corporation is a telecommunications company.[5] IDT was Straight Path's parent until July 31, 2013, when Straight Path was spun off from IDT.[6] As part of the spinoff, Straight Path and IDT entered into a Separation and Distribution Agreement under which IDT agreed to indemnify Straight Path for any liabilities stemming from pre-spinoff conduct.[7]

---

[1] The facts, drawn from the Complaint and other material I may consider on a motion to dismiss, are presumed true for purposes of evaluating the Defendants' Motions to Dismiss.
[2] Compl. ¶ 16.
[3] *Id.*
[4] *Id.*
[5] *Id.* ¶ 17.
[6] *Id.*
[7] *Id.*

3

Defendant Howard Jonas founded IDT in 1990 and has served as its Chairman since then.[8] He was IDT's CEO from December 1991 to July 2001, and again from October 2009 to December 2013.[9] IDT's CEO is now Shmuel Jonas, one of Howard's sons.[10] Howard was the controlling stockholder of Straight Path and IDT, owning over 70% of both companies' voting stock.[11] As of November 2016, Howard held 17.6% of Straight Path's equity,[12] and as of October 2016, he held 11.3% of IDT's equity.[13] Howard's stock in Straight Path was owned by Defendant The Patrick Henry Trust, of which Howard was the beneficiary.[14] Nevertheless, Howard retained certain consent rights with respect to Straight Path.[15] Specifically, Howard's consent was necessary to consummate significant transactions that required approval by Straight Path's stockholders, including a merger or a sale of all assets.[16]

Defendant Davidi Jonas, another one of Howard's sons, has served as Straight Path's CEO and President since April 2013.[17] Davidi has also served as a Straight

---

[8] *Id.* ¶ 18.
[9] *Id.*
[10] *Id.* ¶ 19.
[11] *Id.* ¶ 18. To the extent I use first names here, it is to avoid confusion; no disrespect is meant.
[12] *Id.* ¶ 38.
[13] Clark Aff. Ex. D, at 14.
[14] Compl. ¶ 21.
[15] *Id.*
[16] *Id.* ¶ 39.
[17] *Id.* ¶ 20.

4

Path director since that time, and on August 1, 2013, he became the company's Chairman.[18]  Davidi and his siblings own over 10% of IDT's equity.[19]

Plaintiff JDS1, LLC is an investment vehicle that held Straight Path common stock at all relevant times.[20]  Plaintiff The Arbitrage Fund is a mutual fund that also held Straight Path common stock at all relevant times.[21]

*B. Factual Background*

1. Straight Path's Business and the Spinoff

Straight Path began as a subsidiary of IDT.[22]  Straight Path holds two sets of assets: 39 GHz and 28 GHz wireless spectrum licenses (the "Spectrum Assets"), and intellectual property related to communications over the internet (the "IP Assets").[23] The Spectrum Assets, which IDT controlled before the spinoff,[24] are particularly valuable.  Straight Path owns 70% of the 39 GHz licenses in the United States, and telecommunications companies view these licenses as essential to developing the next generation of wireless networks.[25]  The IP Assets likewise hold significant value.  For example, Straight Path received $18.25 million in proceeds from July

---

[18] *Id.*
[19] *Id.*
[20] *Id.* ¶ 14.
[21] *Id.* ¶ 15.
[22] *Id.* ¶¶ 28, 34.
[23] *Id.* ¶¶ 16, 28, 31.
[24] *Id.* ¶ 35.
[25] *Id.* ¶¶ 29–30.

2013 to February 2015 as a result of its efforts to prosecute its patent rights.[26] Moreover, the IP Assets have recently increased in value due to a string of favorable administrative and court rulings.[27]

On July 31, 2013, IDT spun off Straight Path via a pro rata distribution of Straight Path common stock to IDT stockholders.[28] Following the spinoff, Straight Path maintained a dual-class capital structure in which Howard Jonas, through The Patrick Henry Trust, retained majority voting control while holding only 17.6% of the company's equity.[29] IDT had (and continues to have) a similar capital structure, in which Howard Jonas holds a majority of voting stock while owning only 11.3% of the equity.[30]

As part of the spinoff, Straight Path and IDT negotiated a Separation and Distribution Agreement.[31] That Agreement obligates IDT to indemnify Straight Path for any liabilities arising from or related to the period before the spinoff.[32] Straight

---

[26] *Id.* ¶ 31.
[27] *Id.* ¶ 32.
[28] *Id.* ¶ 36.
[29] *Id.* ¶¶ 37–38.
[30] *Id.* ¶¶ 18, 37; Clark Aff. Ex. D, at 14.
[31] Compl. ¶ 36.
[32] *Id.* Specifically, the Separation Agreement provides that "[o]n and after the Distribution Date, IDT shall indemnify, defend and hold harmless SPCI and its subsidiaries and each of their respective directors, officers, employees and agents (the 'SPCI Indemnitees') from and against any and all Indemnifiable Losses incurred or suffered by any of the SPCI Indemnitees and arising out of, or due to, (a) the failure of IDT or any member of the IDT Group to pay, perform or otherwise discharge, any of the IDT Liabilities, and (b) any breach by IDT or any member of the IDT Group of this Agreement." Clark Aff. Ex. B, § 6.02. The Agreement defines "IDT Liabilities" to include, among other things, "any Liabilities of SPCI or its subsidiaries arising, or related to the period, prior to the Effective Time." *Id.* at 5.

Path's public filings acknowledge this obligation, stating that "[t]he Separation and Distribution Agreement includes, among other things, that IDT is obligated to reimburse [Straight Path] for the payment of any liabilities arising or related to the period prior to the Spin-Off."[33]  Notably, the indemnification right covers liabilities stemming from pre-spinoff conduct related to the Spectrum Assets.[34]

### 2. The FCC Dings Straight Path for Pre-Spinoff Misconduct

Under Federal Communications Commission ("FCC") regulations, holders of 39 GHz licenses are required to submit substantial service filings at the end of each license's term.[35]  In these filings, license holders must demonstrate that they have taken steps to construct systems for making use of their spectrum.[36]  Failure to submit substantial service filings may lead to termination of the licenses.[37]  In November 2015, Sinclair Upton Research issued a report alleging that IDT had defrauded the FCC when it sought renewal of its 39 GHz licenses in 2011 and 2012.[38]  Specifically, Sinclair claimed that almost none of the 39 GHz systems IDT had purportedly constructed were operational at the time of the report.[39]

---

[33] Compl. ¶ 36 (second alteration in original).
[34] *Id.*
[35] *Id.* ¶ 41.
[36] *Id.* ¶ 43.
[37] *Id.* ¶ 41.
[38] *Id.* ¶ 42.
[39] *Id.* ¶ 45.

7

After the Sinclair report came out, Straight Path hired Morgan, Lewis & Bockius LLP to conduct an internal investigation.[40] Morgan Lewis confirmed Sinclair's finding that IDT had failed to comply with the FCC's substantial service requirements.[41] The FCC also began its own investigation.[42] On September 20, 2016, IDT received a letter of inquiry from the FCC requesting information relevant to the investigation.[43] About a month later, IDT filed a Form 10-K in which it disclosed that due to the FCC's investigation, IDT could face a claim from Straight Path related to any fines or penalties the FCC imposed on Straight Path for violations that took place when IDT controlled the Spectrum Assets.[44]

On January 11, 2017, Straight Path entered into a Consent Decree with the FCC.[45] The Consent Decree has three primary components. First, Straight Path agreed to forfeit approximately 20% of its spectrum licenses.[46] Second, Straight Path was required to submit an application to sell its remaining spectrum licenses within one year of the Consent Decree and to pay 20% of the sales proceeds to the FCC.[47] Third, Straight Path agreed to pay a $100 million fine, with the first $15

---

[40] *Id.* ¶ 47.
[41] *Id.*
[42] *Id.* ¶ 49.
[43] *Id.* ¶ 50.
[44] *Id.*
[45] *Id.* ¶ 52.
[46] *Id.* ¶ 53.
[47] *Id.* ¶ 54.

million due in installments over a nine-month period.[48]  If Straight Path sold its remaining spectrum licenses to a third party within one year and gave 20% of the proceeds to the FCC, it would not have to pay the balance of the fine.[49]  On the other hand, if Straight Path failed to sell its spectrum, it would have to pay the $85 million *and* take the risk that the FCC would later seek to cancel the licenses as well.[50] Finally, if Straight Path neither sold the spectrum nor paid the $85 million, it would be required to forfeit its licenses to the FCC.[51]  The upshot of the Consent Decree and the Sinclair Upton report was that Straight Path had no practical choice but to sell itself.[52]

Soon after the Consent Decree was entered, IDT acknowledged that it could face liability on account of the penalties the FCC had just imposed on Straight Path.[53] In a Form 10-Q for the period ending January 31, 2017, IDT stated that it "could be the subject of a claim from Straight Path for indemnification related to its liability related to the consent decree."[54]  The basis for this disclosure was presumably that the fraudulent renewals took place in 2011 and 2012, before Straight Path was spun

---

[48] *Id.* ¶ 55.
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.* ¶¶ 54, 60, 63.
[53] *Id.* ¶ 58.
[54] *Id.*

off from IDT.[55]  To repeat, the Separation Agreement requires IDT to indemnify Straight Path for any liabilities incurred pre-spinoff.[56]

### 3. Straight Path Sells Itself

Even before the Consent Decree (but after the Sinclair report), Straight Path was considering a sale of either the whole company or the Spectrum Assets.[57]  In the summer of 2016, Straight Path held discussions with four interested parties, including AT&T.[58]  In September 2016, AT&T submitted a term sheet to acquire the company for $400 million, and Davidi Jonas, Straight Path's CEO, retained Evercore as the company's financial advisor.[59]  AT&T raised its offer in November 2016, but the Straight Path board—which at the time consisted of Davidi Jonas, William F. Weld, K. Chris Todd, and Fred S. Zeidman[60]—decided to defer the sales process until the FCC's investigation concluded.[61]  When the investigation wrapped up and the Consent Decree was entered, Straight Path's only real option was to sell itself.[62]  Indeed, the Straight Path board later advised Evercore that "it was in the best

---

[55] *Id.* ¶ 57.
[56] *Id.* ¶ 36.
[57] *Id.* ¶ 60.
[58] *Id.*
[59] *Id.* ¶ 61.
[60] *Id.* ¶¶ 20, 22–24.
[61] *Id.* ¶ 62.
[62] *Id.* ¶ 63.

interests of the holders of Straight Path common stock for Straight Path to pursue a competitive process to sell Straight Path."[63]

The sales process began in earnest in February 2017, when the Board told Evercore to reach out to twenty potential bidders.[64] In its first-round bid instruction letter, Evercore informed potential bidders of the 20% penalty owed to the FCC under the Consent Decree.[65] Bidders were told to take the penalty into account in formulating their bids.[66] The result was that Straight Path's stockholders were bound to receive less in a sale than they would have if the FCC had not penalized the company.[67]

On February 6, 2017, the Straight Path board formed a Special Committee made up of all directors save Davidi Jonas.[68] The Special Committee's initial task was to evaluate options for divesting the IP Assets, which both the board and Howard Jonas thought bidders were not interested in.[69] About a week after its formation, however, the Special Committee began discussing Straight Path's indemnification claim against IDT.[70] Specifically, the Special Committee considered "the feasibility of asserting an indemnification claim on behalf of Straight Path against IDT in

---

[63] Clark Aff. Ex. C, at 60.
[64] Compl. ¶ 65.
[65] *Id.* ¶ 66; Clark Aff. Ex. C, at 39.
[66] Compl. ¶ 66.
[67] *Id.*
[68] *Id.* ¶ 69.
[69] *Id.* ¶¶ 68–69.
[70] *Id.* ¶ 71.

11

relation to the FCC consent decree and Straight Path's related liabilities in connection with the Straight Path board's evaluation of Straight Path's strategic alternatives."[71] After a February 14 meeting, the Special Committee unanimously decided to preserve and pursue the indemnification claim for the benefit of Straight Path's stockholders.[72]

On February 28, the Special Committee's lawyers from Shearman & Sterling LLP told Straight Path's counsel at Weil, Gotshal & Manges LLP that the Special Committee intended to preserve the indemnification claim.[73] Shearman told Weil that the Special Committee was exploring several options, including selling only the Spectrum Assets or assigning the indemnification claim to a litigation trust.[74] Either option would enable Straight Path to pursue the claim against IDT post-closing.[75]

The next month, on March 8, the Special Committee met, with Weil and Straight Path's General Counsel in attendance.[76] The Special Committee "expressed and discussed concerns that bidders for Straight Path would not have interest in vigorously pursuing a potential indemnity claim against IDT and thus would not ascribe appropriate value to such claim in their bids to acquire Straight Path."[77] The

---

[71] Clark Aff. Ex. C, at 39–40.
[72] Compl. ¶ 71.
[73] *Id.* ¶ 72.
[74] *Id.*
[75] *Id.*
[76] *Id.* ¶ 73.
[77] Clark Aff. Ex. C, at 40.

12

Special Committee then considered the feasibility of separating the indemnification claim from any sale of Straight Path or, alternatively, negotiating a settlement of the claim.[78] Around this time, the Special Committee instructed its counsel to start planning for the establishment of a litigation trust that could pursue the indemnification claim against IDT post-closing.[79]

The Special Committee met again on March 13; Evercore, Straight Path's General Gounsel, and Weil were in attendance.[80] At this meeting, the Special Committee unanimously determined that it was in the best interests of Straight Path and its stockholders to exclude the indemnification claim from any sale of the company; it also asked that potential bidders be told about this in the second-round bid instruction letter.[81] The letter was sent out the next day.[82]

Davidi Jonas did not attend these Special Committee meetings, but by February 28, he had likely learned of the Committee's interest in preserving the indemnification claim.[83] It is also reasonable to infer that, shortly after the March 13 meeting, Davidi learned of the Committee's definitive plan to exclude the claim from any sale.[84] After all, that meeting (along with the February 28 meeting) was

---

[78] *Id.*
[79] Compl. ¶ 74.
[80] *Id.* ¶ 75.
[81] *Id.*
[82] *Id.*
[83] *Id.* ¶ 76.
[84] *Id.* ¶ 77.

13

attended by Weil, which represents Davidi in this litigation.[85]  In any case, Davidi almost certainly became aware of the Special Committee's intentions by March 14, when Evercore, at the board's direction, sent out the second-round bid instruction letter informing potential bidders of the carve-out.[86]

Davidi recognized that pursuing the indemnification claim against IDT could harm him and his family.[87]  If Straight Path successfully enforced its indemnification right, IDT—which has a market capitalization of less than $350 million—would likely go bankrupt.[88]  Shmuel Jonas, Davidi's brother, is IDT's CEO, and Howard Jonas is its Chairman and controlling stockholder.[89]  Moreover, Davidi and his siblings own over 10% of IDT's outstanding equity.[90]  Thus, the Plaintiffs infer that Davidi, understanding the threat posed by the preservation of the indemnification claim, tipped off his father about the Special Committee's plan.[91]  That is a reasonable inference.  Howard Jonas was not a member of Straight Path's board, and there is no indication that he was granted access to confidential information about the sales process.[92]  Yet, as detailed below, Howard intervened in the process on March 14, almost immediately after his son likely learned of the Special

---

[85] *Id.* ¶¶ 76–77.
[86] *Id.* ¶ 77.
[87] *Id.* ¶ 78.
[88] *Id.* ¶¶ 8, 78.
[89] *Id.* ¶ 78.
[90] *Id.*
[91] *Id.* ¶ 79.
[92] *Id.*

Committee's definitive plan to separate the indemnification claim from any sale of the company.[93]

Howard Jonas did not want the indemnification claim to survive a sale and be pursued against IDT.[94] While he held a greater equity stake in Straight Path than in IDT, successful pursuit of the claim could bankrupt IDT, in which Howard's children held a 10% equity interest.[95] Moreover, the size of the indemnification claim was increasing as the bidding for Straight Path heated up. By the time the second-round bid instruction letter was sent out, Verizon had expressed a willingness to acquire Straight Path for up to $750 million.[96] Thus, at this point in the sales process, the portion of the indemnification claim related to the 20% penalty alone was worth over $100 million.[97] Notably, the Special Committee and its lawyers at Shearman appear to have read the Separation Agreement to mean that IDT would be on the hook for the 20% penalty.[98]

---

[93] *Id.*

[94] *Id.* ¶ 81.

[95] *Id.* ¶¶ 78, 82

[96] *Id.* ¶ 81.

[97] *Id.*

[98] *See* Clark Aff. Ex. C, at 47 ("Also on April 8, 2017, at a telephonic meeting of the special committee, at which representatives of Shearman participated, the special committee instructed representatives of Shearman to seek additional settlement consideration from IDT in light of the substantially increased bids for Straight Path received since the settlement in principle was reached on March 29, 2017, and in light of the increased amount that Straight Path would accordingly have to pay to the FCC under the terms of the FCC consent decree."); *id.* ("On the same date, a representative of Shearman informed a representative of Boies Schiller that, because the bids for Straight Path had climbed to a substantially higher level, the value of the potential indemnification claim had increased significantly, and the special committee was requesting that IDT increase the settlement consideration in light of the significant change in circumstances.").

As soon as he learned of the Special Committee's plan, Howard Jonas took action. On March 14 and 15, Howard personally contacted each member of the Committee and threatened to blow up the sales process if the Committee stuck to its plan of preserving the indemnification claim.[99] Howard's threat was credible because he was Straight Path's controlling stockholder, making his consent necessary to consummate any sale of the company.[100] During these conversations or on other occasions around this time, Howard, per the Complaint, also "personally threatened" the Special Committee members in an effort to get them to waive the indemnification claim for a nominal settlement amount.[101]

On March 15, an IDT representative told Straight Path that Howard Jonas was interested in acquiring the IP Assets as part of a settlement of the indemnification claim.[102] Two days later, Weil met with Howard Jonas and his lawyers from Boies, Schiller & Flexner LLP.[103] Weil noted that bidders would probably ask that Howard and The Patrick Henry Trust enter a voting agreement to support any potential transaction.[104] Howard then told Weil that, although he would not support a sale of Straight Path as a whole, he would consent to selling only the Spectrum Assets.[105]

---

[99] Compl. ¶ 83.
[100] *Id.* ¶ 80.
[101] *Id.* ¶ 83.
[102] *Id.* ¶ 84; Clark Aff. Ex. C, at 41.
[103] Clark Aff. Ex. C, at 41.
[104] *Id.*
[105] *Id.* at 42.

Later, on March 20, one of Howard's lawyers at Boies told counsel for the Special Committee that Howard would not support any transaction that would enable the indemnification claim to be pursued against IDT post-closing.[106]

Howard Jonas met with the Special Committee on March 29 to discuss the indemnification claim and the IP Assets.[107] Weil, Shearman, Boies, and Straight Path's General Counsel were in attendance.[108] Realizing that it was out of options, the Special Committee capitulated to Howard Jonas's demands.[109] The parties reached an agreement in principle to settle the indemnification claim and sell the IP Assets to IDT.[110] On April 2, Evercore sent out the third-round bid instruction letter, which informed bidders of the agreement between Howard and the Special Committee.[111]

Straight Path and IDT executed the initial term sheet on April 6.[112] The Special Committee signed off on the deal "after taking into account both the potential gain in the event that Straight Path were to pursue an indemnification claim against IDT and the costs and risks to the merger transaction."[113] Per the term sheet, Straight Path agreed to sell the IP Assets to IDT for $6 million, even though the Consent

---

[106] *Id.*; Compl. ¶ 84.
[107] Compl. ¶ 86.
[108] Clark Aff. Ex. C, at 43–44.
[109] Compl. ¶ 86.
[110] *Id.*
[111] *Id.*; Clark Aff. Ex. C., at 44.
[112] Compl. ¶ 87; Clark Aff. Ex. C, at 44.
[113] Clark Aff. Ex. C, at 44.

Decree places a $50 million value on Straight Path's "Non-License Portfolio Assets," the vast majority of which are the IP Assets.[114] Straight Path also agreed to settle the indemnification claim against IDT for $10 million plus a right to receive 22% of the net proceeds from the IP Assets.[115] Finally, IDT consented to release any counterclaims it might have against Straight Path.[116]

The day after the initial term sheet was executed, one of Howard's attorneys from Boies asked the Special Committee's counsel to make the agreement binding.[117] The Boies attorney expressed the view that "consummation of the merger should not be contingent upon further documentation of the settlement between IDT and Straight Path."[118] As the Plaintiffs point out, however, the bidding war for Straight Path was continuing unabated at this time; indeed, the same day this conversation took place, Verizon proposed to acquire the company for $1.262 billion.[119] Again, as the bids for Straight Path increased, IDT's potential liability to Straight Path increased as well.

The Special Committee met by phone on April 8.[120] Recognizing that the value of the indemnification claim was increasing by the day, the Special Committee

---

[114] Compl. ¶¶ 88, 90. IDT later resold the IP Assets to Howard Jonas for $6 million. *Id.* ¶ 88.
[115] *Id.* ¶ 88; Clark Aff. Ex. C, Annex A, Ex. B, at 1–2.
[116] Clark Aff. Ex. C, Annex A, Ex. B, at 1.
[117] Clark Aff. Ex. C, at 46.
[118] *Id.*
[119] *Id.* at 45–46.
[120] *Id.* at 47.

instructed its lawyers to seek additional settlement consideration from IDT.[121] When counsel for the Committee did as they were told and tried to get a better deal for Straight Path, Howard Jonas's lawyers at Boies "emphatically rejected the . . . request."[122] Worse, the Boies attorneys threatened litigation against both Shearman and the Special Committee members personally if the Committee sought to renegotiate the term sheet.[123] The Special Committee relented, reasoning that "it was not worth taking any risk of holding up the prospective merger in light of the vastly improved offers for Straight Path, which . . . would greatly benefit stockholders."[124] Thus, on April 9, Straight Path and IDT signed a revised term sheet that reflected IDT's request to make the agreement binding.[125]

### 4. Verizon Agrees to Acquire Straight Path for $3.1 Billion

The same day Straight Path and IDT executed the revised term sheet, AT&T informed Davidi that it was prepared to offer $1.6 billion to acquire Straight Path.[126] The offer was contingent on Straight Path approving the transaction that evening.[127] The board unanimously approved the deal, and Straight Path and AT&T executed the merger agreement, which allowed Straight Path to consider superior third-party

---

[121] *Id.*; Compl. ¶ 93.
[122] Clark Aff. Ex. C, at 47.
[123] Compl. ¶ 93.
[124] Clark Aff. Ex. C, at 47.
[125] *Id.*
[126] *Id.* at 48.
[127] *Id.*

offers.[128]  Four days later, Verizon sent a letter to Evercore indicating that it was considering a topping bid.[129]  A bidding war between AT&T and Verizon ensued.[130]  Verizon ultimately prevailed, and on May 11, 2017, it entered into the operative merger agreement with Straight Path.[131]  Verizon agreed to acquire Straight Path at a total enterprise value of $3.1 billion, or $184 in Verizon stock.[132]  The merger consideration represents a 486% premium to the closing price of Straight Path's common stock on January 11, 2017, the day before the company announced the FCC settlement and the strategic alternatives process.[133]  As part of the deal, Howard Jonas agreed to vote his stock in favor of the merger.[134]  Straight Path's stockholders approved the transaction on August 2, 2017.[135]

> ### 5. The Merger Closes, and Straight Path and Verizon Pay the FCC over $600 Million

On February 28, 2018, the Verizon merger closed, and the FCC received $614 million in accordance with the Consent Decree entered in January 2017.[136]  The

---

[128] *Id.* at 49; Compl. ¶ 97.
[129] Clark Aff. Ex. C, at 49.
[130] *Id.* at 49–53.
[131] *Id.* at 53; Compl. ¶ 98.
[132] Compl. ¶ 98.
[133] Clark Aff. Ex. C, at 54.
[134] Compl. ¶ 98.
[135] *Id.* ¶ 98 n.9.
[136] Mar. 2, 2018 Letter.

payment represents the largest civil penalty ever paid to the United States Treasury to resolve an FCC investigation.[137]

*C. This Litigation*

This action began on July 5, 2017. Plaintiff JDS1 immediately moved for an expedited trial, and I denied the request on July 24. That same day, I consolidated the JDS1 action with a related case that had been filed on July 11 by Plaintiff The Arbitrage Fund. JDS1's initial complaint named Straight Path's outside directors as defendants. At the hearing on the motion to expedite, however, JDS1's counsel stated that the outside directors would be dismissed from the action without prejudice.[138] At the same hearing, counsel for the outside directors indicated that a majority of the Straight Path board would not authorize the company to move to dismiss under Court of Chancery Rule 23.1.[139] The outside directors saw "it as their duty to the company and the public stockholders, in the context of this controller transaction, not to stand in the way of the Court's consideration of any claim that could ultimately benefit the company and all stockholders."[140]

The Plaintiffs amended their Complaint on August 29, 2017. The Complaint is styled as a class action directly challenging the Verizon merger, though the

---

[137] Mar. 26, 2018 Letter Ex. 2.
[138] July 24, 2017 Oral Arg. Tr. 11:21–24.
[139] *Id.* at 15:18–16:4.
[140] *Id.* at 15:24–16:4.

21

Plaintiffs alternatively bring it as a derivative action.[141]  The Complaint contains four counts.  Count I alleges that Howard Jonas, as Straight Path's controlling stockholder, breached the fiduciary duties he owed to Straight Path and its stockholders.[142]  Specifically, the Complaint charges Howard with using his position as a controlling stockholder to extract unique benefits from the sales process, to the detriment of the company's minority stockholders.[143]  Those benefits included the settlement of the indemnification claim for well below its fair value and the acquisition of the IP Assets, previously valued at around $50 million, for only $6 million.  Count II alleges that Davidi Jonas breached his fiduciary duties to Straight Path and its stockholders by putting his (and his family's) interests above those of the company and its stockholders.[144]  Count III alleges that IDT aided and abetted Howard and Davidi Jonas's breaches of fiduciary duty.[145]  Finally, Count IV is brought derivatively, and it seeks a declaratory judgment and a constructive trust, though these requests are moot now that the merger has closed.[146]

---

[141] Compl. ¶¶ 102, 113.

[142] *Id.* ¶¶ 120–24.  Count I is brought against both Howard Jonas and The Patrick Henry Trust.  *Id.* at 43.

[143] *Id.* ¶ 122.

[144] *Id.* ¶¶ 125–29.

[145] *Id.* ¶¶ 130–33.

[146] *Id.* ¶¶ 134–39.

The Defendants moved to dismiss the Complaint on September 13, 2017. Howard Jonas[147] argues that the Plaintiffs' claims are derivative rather than direct, and that the derivative claims fail as a matter of law. He also argues that, regardless of whether the claims are direct or derivative, the Complaint fails to plead any breach of fiduciary duty.[148] Davidi Jonas separately argues that the Complaint fails to state a claim against him. According to Davidi, any breach of fiduciary duty claim against him fails because, even if he had not tipped off his father as to the Special Committee's plan to preserve the indemnification claim, Howard would have learned of the plan anyway. I heard oral argument on these Motions on November 3, 2017. On November 20, 2017, I issued a Letter Opinion holding that the matter was not ripe for decision, because if the merger failed to close, any ruling on whether the Plaintiffs pled a direct claim would amount to an advisory opinion.[149] I also noted that if the merged closed, any direct claims would be ripe, while any derivative claims would fall away.[150]

As noted above, the merger closed on February 28, 2018. The Plaintiffs so informed me on March 2, 2018, upon which I deemed the matter fully submitted.

---

[147] For simplicity, I sometimes refer to Howard Jonas, IDT, and The Patrick Henry Trust collectively as "Howard Jonas."

[148] Howard Jonas additionally argues that because the Plaintiffs have failed to plead an underlying breach of fiduciary duty, the aiding and abetting claim against IDT must be dismissed as well.

[149] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2017 WL 5565264, at *3 (Del. Ch. Nov. 20, 2017).

[150] *Id.* at *4. In addition, I declined to decide whether the Plaintiffs adequately alleged demand futility. *Id.*

## II. ANALYSIS

The Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6).[151] When reviewing such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[152]

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[153]

### A. Direct or Derivative?

Howard Jonas argues that the Plaintiffs' claims are derivative rather than direct. According to him, the allegations in the Complaint boil down to the assertion that IDT did not pay Straight Path enough for the settlement of the indemnification claim and the IP Assets. Thus, it was Straight Path that suffered the injury, and any harm befalling the stockholders was merely an indirect result of the underlying depletion of corporate assets. If Howard Jonas is correct that the Plaintiffs' claims are derivative, the Complaint must be dismissed. That is because the Verizon merger

---

[151] Howard Jonas has also moved to dismiss under Rule 23.1, but because I find that the Plaintiffs' claims are direct (and because the merger has closed), I need not address Howard's demand futility arguments.

[152] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

[153] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

has closed, and it is black-letter law that a plaintiff loses standing to sue derivatively when she ceases to be a stockholder following a merger.[154] In my view, the Plaintiffs' claims are properly characterized as direct. Thus, the Plaintiffs did not lose standing when the Verizon merger closed.

"To determine whether a claim is derivative or direct, this Court must consider '(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'"[155] "The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[156] *Tooley* requires this Court to look beyond the labels used to describe the claim, evaluating instead the nature of the wrong alleged.[157] "Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the

---

[154] *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984). There are two exceptions to this rule: "(i) if the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of the standing to bring a derivative action; or (ii) if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise." *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 354 (Del. 1988). Because the Plaintiffs' claims are direct rather than derivative, I need not decide whether these two exceptions apply here.

[155] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 655 (Del. Ch. 2013) (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)).

[156] *Tooley*, 845 A.2d at 1039.

[157] *E.g.*, *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 817 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006).

corporation's stock solely because they are stockholders, then the claim is derivative in nature."[158]

Application of these principles assumes heightened significance in the post-merger context.[159] As noted above, under *Lewis v. Anderson*, a stockholder loses standing to pursue derivative claims when a merger extinguishes her status as a stockholder.[160] Thus, "[i]n the context of a merger transaction, the derivative-individual distinction is essentially outcome-determinative of any breach of fiduciary duty claims that can be asserted in connection with the merger by the target company stockholders."[161] If the claims are deemed derivative, the lawsuit ends.[162] If they are found to be direct, however, the plaintiff may continue to pursue them.[163] The caselaw that has developed to address the question of standing in the post-merger context is often hard to reconcile.[164] Nevertheless, the decisions provide some helpful guidance.

---

[158] *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).

[159] *Golaine v. Edwards*, 1999 WL 1271882, at *4 (Del. Ch. Dec. 21, 1999); *see also Feldman*, 951 A.2d at 731 ("It is now well established that a plaintiff may avoid dismissal of his derivative claims following a merger in only two circumstances: where the claims asserted are direct, rather than derivative, or whether one of the exceptions recognized in *Lewis v. Anderson* applies.").

[160] 477 A.2d at 1049.

[161] *Golaine*, 1999 WL 1271882, at *4.

[162] *Id.*

[163] *Id.*

[164] *See, e.g.*, *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 75 (Del. 1999) ("The application of th[e direct/derivative test]-especially with respect to complaints challenging board actions taken for defensive reasons or in the context of change of control transactions-has yielded less than predictable results. Some of these results seem to flow from whether the plaintiff cited the correct magic words, rather than from any real distinction between the relief sought or [*sic*] the injury suffered.").

The basic rule is simple enough: "A stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated."[165] Put differently, to state a direct claim under *Parnes*, "a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."[166] The difficulty lies in distinguishing between challenges to the merger itself and challenges to mere "wrongs associated with the merger."[167] The former state direct claims; the latter, if sufficiently remote from the merger itself, give rise to derivative claims, which target stockholders typically cannot pursue post-merger.[168]

A review of the caselaw helps illustrate these principles. *Parnes* involved allegations that the CEO of Bally Entertainment Corporation "informed all potential acquirors that his consent would be required for any business combination with Bally and that, to obtain his consent, the acquiror would be required to pay [him] substantial sums of money and transfer to him valuable Bally assets."[169] The CEO had no legal authority to make these demands, and several potential acquirors

---

[165] *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999).
[166] *Id.*
[167] *Id.*
[168] *See Dieterich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004) (noting that *Parnes* does not mean "all shareholder claims for breach of fiduciary duty are direct if they involve a merger").
[169] *Parnes*, 722 A.2d at 1245.

declined to bid because they did not want to participate in illegal transactions.[170] Nevertheless, Hilton Hotels Corporation agreed to the CEO's demands.[171] The Supreme Court held that these allegations stated a direct claim because they "directly challenge[d] the fairness of the process and the price in the Bally/Hilton merger."[172]

The *Parnes* Court contrasted the facts before it with those in *Kramer v. Western Pacific Industries, Inc.*, which the Supreme Court had decided over a decade earlier.[173] In *Kramer*, two of the target corporation's directors allegedly breached their fiduciary duties by "diverting to themselves eleven million dollars of the [merger] proceeds through their receipt of stock options and golden parachutes and [by] incurring eighteen million dollars of excessive or unnecessary fees and expenses in connection with the [merger]."[174] The plaintiff in *Kramer* did not claim that these transactions made the merger price unfair or tainted the sales process.[175] Thus, even though the plaintiff alleged that the challenged transactions reduced the consideration paid to the target stockholders, the Supreme Court held that the complaint stated a derivative claim for "mismanagement resulting in waste of corporate assets."[176]

---

[170] *Id.* at 1245–46.
[171] *Id.* at 1246.
[172] *Id.* at 1245.
[173] *Id.*
[174] *Kramer*, 546 A.2d at 350.
[175] *Id.* at 354.
[176] *Id.* at 353 & n.7.

*Parnes* distinguished *Kramer* as follows: "Although the complaint [in *Kramer*] did allege that wrongful transactions associated with the merger . . . reduced the amount paid to [the target's] stockholders, it did not allege that the merger price was unfair or that the merger was obtained through unfair dealing."[177]  As former Chancellor Chandler pointed out, the distinction drawn by *Parnes* is less than clear:

> The rationale given by the Supreme Court in *Parnes* for distinguishing *Kramer* is somewhat indeterminate. Although the complaint in *Kramer* may not have alleged that the merger price was unfair, it did allege that shareholders received less of the merger proceeds because of a series of wrongful transactions leading up to the merger. It elevates form over substance to allow a complaint to go forward simply by adding a sentence to the complaint that alleges that the wrongful transactions at issue resulted in an unfair merger price. Such a standard would seemingly allow a plaintiff's designation to trump the body of the complaint.[178]

In other words, the Chancellor appears to have recognized that the distinction articulated in *Parnes* embodies the type of formulaic pleading requirement that Delaware law has generally rejected.  Nevertheless, *Tooley* itself stated that both *Parnes* and *Kramer* had been correctly decided.[179]

In *Golaine v. Edwards*, Chief Justice Strine, writing as a Vice Chancellor, attempted a synthesis of *Parnes* and *Kramer*.[180]  The Court concluded that "the real

---

[177] *Parnes*, 722 A.2d at 1245.
[178] *Agostino v. Hicks*, 845 A.2d 1110, 1119 (Del. Ch. 2004); *see also In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d at 75–76 (noting that the difference in outcomes between *Parnes* and *Kramer* "seem[s] to flow from whether the plaintiff cited the correct magic words, rather than from any real distinction between the relief sought or the injury suffered").
[179] *Tooley*, 845 A.2d at 1038–39.
[180] *Golaine*, 1999 WL 1271882, at *5–7.

question underlying the teaching of *Parnes* [is] whether the complaint states a claim that the side transactions caused legally compensable harm to the target's stockholders by improperly diverting consideration from them to their fiduciaries."[181] Viewed in this way, "the derivative-individual distinction as articulated in *Parnes* is revealed as primarily a way of judging whether a plaintiff has stated a claim on the merits."[182] According to the *Golaine* Court, the *Parnes* inquiry should focus "on whether compensable injury to the target stockholders is alleged rather than on whether the target stockholder's complaint has articulated only a waste or mismanagement claim for which there is likely no proper plaintiff on earth."[183] Thus, to state a direct claim under *Parnes* and *Kramer*, "the target stockholder plaintiff must, at the very least, allege facts showing that the side payment improperly diverted proceeds that would have, if the defendant directors had acted properly, ended up in the consideration paid to the target stockholders."[184]

In my view, *Parnes* and its progeny compel the conclusion that the Complaint here states direct claims challenging the fairness of the Verizon merger. The January 2017 Consent Decree required Straight Path to forfeit 20% of its spectrum licenses,

---

[181] *Id.* at *7.

[182] *Id.*

[183] *Id.*

[184] *Id.* at *9; *see also Houseman v. Sagerman*, 2014 WL 1600724, at *13 (Del. Ch. Apr. 16, 2014) (holding that, to state a direct claim under *Parnes*, "the plaintiff must plead facts supporting an inference that the side payment represented an improper diversion and that, absent the impropriety, the consideration would have gone to the stockholders").

sell its remaining licenses within one year, and relinquish 20% of the sales proceeds to the FCC. Because wireless spectrum made up the vast majority of Straight Path's assets, the Consent Decree essentially forced the company to sell itself. Fortunately, Straight Path had a way to seek compensation for the penalties the FCC imposed on it. As part of the spinoff from IDT, Straight Path received a right to indemnification from its former parent for liabilities incurred pre-spinoff. The misconduct giving rise to the Consent Decree occurred in 2011 and 2012, and the spinoff took place in July 2013. Thus, the indemnification claim could enable Straight Path to recover, among other things, the 20% penalty it would pay to the FCC in the event of a sale. The problem was that potential acquirers would probably have little interest in purchasing, in addition to wireless spectrum, a lawsuit against IDT, a company controlled by Howard Jonas.[185] Accordingly, any sale of Straight Path that did not preserve the indemnification claim could have the effect of depriving stockholders of *one-fifth* of the merger consideration.

The Special Committee recognized this. It therefore set about preserving the indemnification claim so that, once the merger closed, Straight Path could recover the portion of the sales proceeds that would be remitted to the FCC. The Special

---

[185] *See, e.g.*, *Carsanaro*, 65 A.3d at 664 ("[I]t can be inferred reasonably at the pleadings stage that the buyer is paying to acquire the target company's business and not for the right to sue the target company's fiduciaries. Acquirers buy businesses, not claims. Merger-related financial analyses focus on the business, not on fiduciary duty litigation.").

31

Committee instructed its counsel to draft the paperwork necessary to create a litigation trust. The trust would pursue the indemnification claim against IDT post-merger. It would exist for the benefit of the Straight Path stockholders, and not Straight Path itself; upon sale of the company, then, stockholders would receive two forms of consideration—a beneficial interest in the trust and a proportionate share of consideration paid by the buyer.

These developments spelled trouble for Howard Jonas and his family. Howard controlled a majority of the voting stock of Straight Path and IDT. And while he held a larger equity stake in Straight Path than in IDT (17.6% versus 11.3%), his children separately held 10% of IDT's outstanding equity. Moreover, given IDT's market capitalization, successful pursuit of the indemnification claim could bankrupt the company Howard had founded approximately thirty years before. Indeed, if IDT went bankrupt, the bankruptcy trustee might consider pursuing breach of fiduciary claims against Howard, who had served as the company's CEO at the time of the spectrum-related misconduct. Howard would thus have reason to fear the prospect that an entity he could not control would collect on the massive debt IDT owed to Straight Path. Accordingly, once he learned of the Special Committee's plan, Howard used his leverage as Straight Path's controlling stockholder to force the company to settle IDT's debt at an amount manifestly below fair value. Howard accomplished this by threatening to block any sale that would allow the

indemnification claim to be pursued against IDT post-closing. Howard's threats put the Special Committee in a bind: it could capitulate to Howard's demands and deprive stockholders of the value represented by the indemnification claim, or it could stick to its plan and risk blowing up a sales process that was likely to generate a large premium for the stockholders.[186]

The Special Committee ultimately gave in to Howard's demands, and the indemnification claim was settled for $10 million plus a right to receive 22% of the net proceeds from the IP Assets. As part of the settlement, Straight Path also agreed to sell the IP Assets to IDT for $6 million, even though the Consent Decree places a $50 million value on Straight Path's "Non-License Portfolio Assets," almost all of which are the IP Assets. The settlement agreement was made binding on April 9, the same day AT&T offered to acquire Straight Path for $1.6 billion. And Straight Path was ultimately sold to Verizon for $3.1 billion. Because the indemnification claim gave Straight Path the right to recover 20% of the sales price, the settlement

---

[186] Howard Jonas argues that the Special Committee was not actually in a bind because he expressed support for "a sale of only Straight Path's wireless spectrum assets—which were the only assets that had to be sold pursuant to the FCC consent decree." Clark Aff. Ex. C, at 42. Of course, selling only the spectrum would leave Howard in control of Straight Path. Given the extraordinary steps he took to eliminate the indemnification claim, it is reasonable to infer that he would likewise do whatever he could to prevent the claim from being asserted against IDT after an asset sale. Moreover, Straight Path's board advised Evercore that "it was in the best interests of the holders of Straight Path common stock for Straight Path to pursue a competitive process to sell Straight Path." Clark Aff. Ex. C, at 60. That supports a pleading-stage inference that a sale of Straight Path, rather than an asset sale, was the optimal transaction structure for the company's stockholders.

agreement effectively deprived the company's stockholders of a claim potentially worth over half a billion dollars as part of the sale of the company. What Straight Path and its stockholders received in return was a small fraction of that potential recovery.

These allegations support a reasonable inference that Howard Jonas, through IDT, improperly diverted merger consideration that otherwise would have gone to the stockholders. In the transaction structure proposed by the Special Committee, the stockholders would receive the $3.1 billion minus the 20% penalty paid to the FCC. But the indemnification claim would survive the sale, so the litigation trust would be able to recover the 20% penalty from IDT. Thus, if the Special Committee had established the litigation trust, the stockholders would have effectively received a much higher total price in the Verizon sale.

That is not what happened, of course. Instead, Howard Jonas insisted that the indemnification claim be settled for a relatively small amount of consideration. Howard extracted significant, non-ratable benefits from this settlement: forgiveness of IDT's enormous debt, and the assurance that IDT would not face bankruptcy as a result of its obligations to Straight Path. Yet the settlement directly harmed Straight Path's other stockholders, who ended up receiving hundreds of millions of dollars

less in merger consideration than they would have but for Howard's disloyalty.[187] For these reasons, the Complaint supports a reasonable inference that Howard Jonas "improperly diverted proceeds that would have, if [he] had acted properly, ended up in the consideration paid to the target stockholders."[188] The Complaint also establishes "a causal link between the breach complained of and the ultimate unfairness of the merger."[189] Accordingly, the Plaintiffs have stated direct claims under *Parnes* and its progeny.[190]

Howard Jonas tries to avoid this outcome by arguing that this case is really about Straight Path wasting valuable assets, and that the sales process was merely the backdrop for acts of corporate mismanagement. Specifically, Howard suggests that the settlement agreement—in which Straight Path gave up assets for less than they were worth—*could have* occurred in a non-merger context. To the extent that is correct, it does not make the Plaintiffs' claims, under the facts pled, derivative.

---

[187] Contrary to Howard Jonas's suggestion, the Plaintiffs' claims are not derivative simply because the Complaint fails to allege that any potential acquirer would have paid more than Verizon's bid of $184 per share. The Plaintiffs do not argue that the consideration received by the stockholders was unfair because other bidders could have topped Verizon's offer. Instead, the Plaintiffs allege that Howard Jonas took a massive amount of merger consideration off the table by coercing the Special Committee into settling the indemnification claim (and selling IDT the IP Assets) for less than fair value.

[188] *Golaine*, 1999 WL 1271882, at *9.

[189] *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *10 (Del. Ch. Sept. 30, 2009).

[190] While the Complaint does not explicitly allege that Howard Jonas conditioned his support for the merger on receipt of the IP Assets, IDT's acquisition of those Assets was part of the same settlement agreement that released the indemnification claim. Thus, at the pleading stage, it is reasonable to infer that IDT's acquisition of the IP Assets at an allegedly unfair price was part of the improper diversion of merger proceeds on which the Plaintiffs' direct claims are premised.

Howard Jonas explicitly conditioned his support for a sale of the company on the elimination of the indemnification claim. Indeed, he threatened to blow up any sale unless the Special Committee dropped its plan to preserve the claim. Howard thus manipulated the sales process to secure significant benefits for IDT and himself at the expense of Straight Path's other stockholders. This is not a situation in which, before merger talks began, a company's fiduciaries made poor business decisions that ultimately led to a reduction in the merger consideration paid to the stockholders.[191] Rather, the side benefits Howard Jonas extracted from the sales process were directly related to the Verizon merger.[192] Contrary to Howard's suggestion, the Complaint does not present only "textbook derivative claims,"[193] and the Plaintiffs' standing was not extinguished by the merger.

---

[191] *Cf. In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 998 (Del. Ch. 2004) ("The conclusion that the claims asserted here are derivative, not direct, is not altered by the fact that, when Fu's misconduct was ultimately disclosed, an effect of that disclosure was to cause a reduction in the exchange ratio in the Cardinal/Syncor merger agreement. This is merely a coincidental, indirect consequence of Fu's acts that resulted from the awkward timing of the disclosure. . . . The change in the terms of the then-pending merger agreement simply reflected a change in the market value of Syncor resulting from the public disclosure of Fu's alleged misconduct and Cardinal's ability to bargain for a better deal.").

[192] This case is therefore distinguishable from *Kramer*, in which the Supreme Court noted that the plaintiff's claims were "largely unrelated" to the merger. 546 A.2d at 352.

[193] IDT Defs.' Opening Br. 25; *cf. Gentile v. Rossette*, 2005 WL 2810683, at *6 (Del. Ch. Oct. 20, 2005) ("[H]ere the challenged side benefits were (as Plaintiffs allege) entirely related to the merger-consummation of the merger was actually conditioned upon Rossette's receipt of some 'inducement.'"), *rev'd on other grounds*, 906 A.2d 91 (Del. 2006).

*B. Does the Complaint Plead Viable Claims for Breach of Fiduciary Duty?*

Having held that the Plaintiffs have standing to sue under *Parnes*, I next consider whether the Complaint states viable claims for breach of fiduciary duty.[194] Howard and Davidi Jonas argue that the Complaint fails to state claims against them. Howard's primary contention is that he was simply exercising his right as Straight Path's controlling stockholder to vote "no" on the transaction structure proposed by the Special Committee. According to Howard, that is not enough to state a claim for breach of fiduciary duty. Howard also argues that the Plaintiffs have failed to allege that the Verizon merger was unfair to Straight Path's stockholders. Davidi separately argues that his alleged misconduct—tipping off his father about the Special Committee's plan—cannot sustain a breach of fiduciary duty claim because, even if he had not leaked the plan, his father would have inevitably learned the information necessary to commit a breach. I analyze the allegations relevant to Howard and Davidi separately. In my view, the Complaint adequately pleads claims for breach of fiduciary duty against both of them.

### 1. Howard Jonas

"A controlling stockholder owes fiduciary duties to the corporation and its minority stockholders, and it is prohibited from exercising corporate power . . . so

---

[194] *See In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 477 (Del. Ch. 2013) ("If standing exists [under *Parnes*], then the plaintiff must still plead a viable claim.").

as to advantage [itself] while disadvantaging the corporation."[195]   While a controlling stockholder is entitled to act in its own self-interest, that right "must yield . . . when a corporate decision implicates a controller's duty of loyalty."[196]   For example, a controlling stockholder may "control and vote [its] shares in [its] own interest," but it must do so in accordance with "any fiduciary duty owed to other stockholders."[197] Delaware law imposes fiduciary duties on controllers because they are able to "exert[] [their] will over the enterprise in the manner of the board itself."[198]   "The purpose of controlling stockholder liability is to make sure that controlling stockholders do not use their control to reap improper gains [at the expense of the minority] through unfair self dealing or other disloyal acts."[199]

Not all transactions involving controlled companies are subject to heightened judicial scrutiny.[200]   Delaware's default standard of review for corporate decisions is the business judgment rule, "which directs the court to presume the board of directors 'acted on an informed basis, in good faith and in the honest belief that the

---

[195] *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *22 (Del. Ch. Mar. 26, 2018) (second alteration in original) (citation, internal quotation marks, and emphasis omitted).
[196] *Id.*
[197] *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987).
[198] *Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 759 (Del. Ch. 2006).
[199] *Shandler v. DLJ Merchant Banking, Inc.*, 2010 WL 2929654, at *16 (Del. Ch. July 26, 2010).
[200] *See, e.g.*, *IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017) ("[C]ontrolling stockholders are not automatically subject to entire fairness review when a controlled corporation effectuates a transaction.").

action was taken in the best interests of the company.'"[201] To rebut the business judgment rule in the context of a controlled corporation, the plaintiff must adequately allege that the controller engaged in a conflicted transaction.[202] "Conflicted transactions include those in which the controller stands on both sides of the deal (for example, when a parent acquires its subsidiary), as well as those in which the controller stands on only one side of the deal but 'competes with the common stockholders for consideration.'"[203] "In either circumstance, entire fairness review will apply *ab initio*."[204]

This Court has identified three examples of conflicted transactions in which a controller competes with minority stockholders for consideration:

> (1) where the controller receives greater monetary consideration for its shares than the minority stockholders; (2) where the controller takes a different form of consideration than the minority stockholders; and (3) where the controller gets a unique benefit by extracting something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders.[205]

Transactions in these three categories "face entire fairness scrutiny to assuage the risk that a controller who stands to earn 'different consideration or some unique

---

[201] *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).

[202] *Crane*, 2017 WL 7053964, at *6.

[203] *Larkin*, 2016 WL 4485447, at *8 (footnote omitted) (quoting *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014)).

[204] *Id.*

[205] *Crane*, 2017 WL 7053964, at *6 (citations, internal quotation marks, and footnotes omitted).

benefit' will flex his control to secure that self-interested deal to the detriment of minority stockholders."[206]

Here, entire fairness applies because Howard Jonas used his power as a controlling stockholder to extract unique, non-ratable benefits from the sales process. By threatening to withhold support for any sale that would allow the indemnification claim to be pursued against IDT, Howard got the Special Committee to agree to forgive a potentially half-billion-dollar debt IDT owed to Straight Path. In exchange, Straight Path received $10 million and a portion of the proceeds from the IP Assets.[207] While Howard's equity stake in Straight Path was larger than that in IDT, his children held 10% of IDT's equity, and one of his sons was IDT's CEO. Moreover, IDT—which Howard founded and continues to control—likely faced bankruptcy if Straight Path successfully enforced its indemnification right. Howard was IDT's CEO at the time of the misconduct that gave rise to the Consent Decree, so it is reasonable to infer that, if IDT went bankrupt, the bankruptcy trustee would consider pursuing claims against Howard for breach of fiduciary duty. The Complaint plausibly alleges that these benefits were material to Howard. And, as discussed above, they came at the expense of Straight Path's minority stockholders, who received materially less merger consideration as a result of Howard's disloyalty.

---

[206] *Larkin*, 2016 WL 4485447, at *9.

[207] Howard Jonas also received the non-ratable benefit of the IP Assets, which IDT purchased from Straight Path for $6 million and then immediately resold to Howard for the same amount.

40

Howard Jonas responds by invoking principles of stockholder democracy. He says that he was simply exercising his right as a stockholder to "just say no" to a transaction he disapproved of. Not so. It is true that "a stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority."[208] And a controlling stockholder need not "engage in self-sacrifice for the benefit of minority shareholders."[209] But that "does not mean that the controller or its affiliates are immune from claims for the improper exercise of fiduciary power."[210] "If the controller attempts to squeeze out the minority, cause the controlled entity to engage in interested transactions, or other such conduct, the duty of loyalty operates to police the controller's conduct."[211]

*In re Delphi Financial Group Shareholder Litigation*[212] illustrates that a controller's right to refuse to support a transaction does not imply a right to exploit minority stockholders. In *Delphi*, the target corporation maintained a dual-class capital structure in which Class A shares were held mostly by the public and Class

---

[208] *Bershad*, 535 A.2d at 845; *see also Frank v. Elgamal*, 2014 WL 957550, at *21 (Del. Ch. Mar. 10, 2014) ("Because a controlling stockholder has no duty to sell its stock, it has the obvious ability to reject any transaction it does not like.").

[209] *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1040 (Del. Ch. 2012).

[210] *Buttonwood Tree Value Partners, LP v. Sullivan*, 2015 WL 6437218, at *1 (Del. Oct. 22, 2015).

[211] *Id.*; *see also Mendel v. Carroll*, 651 A.2d 297, 306 (Del. Ch. 1994) ("To acknowledge that the Carroll Family has no obligation to support a transaction in which they would in effect sell their stock is not, of course, to suggest that they can use their control over the corporation to effectuate a self-interested merger at an unfair price.").

[212] 2012 WL 729232 (Del. Ch. Mar. 6, 2012).

B shares were held entirely by the controlling stockholder.[213] The controller held 49.9% of the target's voting power on account of his Class B shares, but his stock ownership accounted for only 12.9% of the outstanding equity.[214] The target's charter required that holders of Class A and Class B shares receive equal consideration in the event of a merger.[215] Nevertheless, the controlling stockholder conditioned his support for the merger on receiving a control premium, which in turn required a charter amendment removing the equal-consideration requirement.[216] The controller argued that because he was "generally unconstrained by fiduciary duties when deciding whether to sell his stock, he [was] permitted to condition his approval of a sale on both a restoration of his right to receive a control premium and on actually receiving such a premium."[217] This Court rejected that argument, finding it reasonably likely that the plaintiffs would be able to show at trial that "in negotiating for disparate consideration and only agreeing to support the merger if he received it, [the controller] violated duties to the stockholders."[218]

Here, Howard Jonas did not simply refuse to support a sale of Straight Path. He did not "just say no," as was his right as a stockholder.[219] Instead, he conditioned

---

[213] *Id.* at *3.
[214] *Id.*
[215] *Id.*
[216] *Id.* at *7, *9.
[217] *Id.* at *16.
[218] *Id.* at *17.
[219] *See, e.g.*, *Peter Schoenfeld Asset Mgmt. LLC v. Shaw*, 2003 WL 21649926, at *2 (Del. Ch. July 10, 2003) ("A majority shareholder has discretion as to when to sell his stock and to whom, a

his support for the merger on receiving unique, non-ratable benefits at the expense of the company's minority stockholders. Worse, he made personal threats against the members of the Special Committee to secure their consent, and he threatened to undercut the sales process if he did not get his way.[220] These allegations are sufficient to subject the Verizon merger to entire fairness review.[221] Indeed, entire fairness review is particularly appropriate here, where "a controller who [stood] to

---

discretion that comes from the majority shareholder's rights *qua* shareholder." (citation and internal quotation marks omitted)), *aff'd*, 840 A.2d 642 (Del. 2003).

[220] According to Howard Jonas, the Plaintiffs fail to allege that he engaged in any wrongdoing in connection with the sales process. Specifically, Howard claims that "[t]he Complaint contains no basis for leaping to the conclusion that Jonas pressured Straight Path to settle th[e] [indemnification] claim (or sell the IP Assets) at any particular price, let alone an unfair one." IDT Defs.' Opening Br. 40. For reasons that should be clear by now, Howard is wrong. To take just one example, the Complaint specifically alleges that Howard "personally threatened the Special Committee members in order to coerce them into agreeing to eliminate the Indemnification Claim for *nominal consideration*." Compl. ¶ 83 (emphasis added).

[221] Howard Jonas argues that the business judgment rule applies because the settlement agreement was approved "by an independent board in the exercise of its judgment." IDT Defs.' Opening Br. 52. That is incorrect. The business judgment rule will apply to a conflicted transaction involving a controlling stockholder where the "controller agrees up front, before any negotiations begin, that the controller will not proceed with the proposed transaction without both (i) the affirmative recommendation of a sufficiently authorized board committee composed of independent and disinterested directors and (ii) the affirmative vote of a majority of the shares owned by stockholders who are not affiliated with the controller." *In re EZCORP Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *11 (Del. Ch. Jan. 25, 2016), *reconsideration granted in part*, 2016 WL 727771 (Del. Ch. Feb. 23, 2016); *see also In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *2 (Del. Ch. Aug. 18, 2017) (concluding that this framework applies "to conflicted one-side controller transactions"). "Threats, coercion, or fraud on the part of the controlling stockholder, however, may nullify either procedural protection." *In re Delphi Fin. Grp. S'holder Litig.*, 2012 WL 729232, at *12 n.57 (citation and internal quotation marks omitted). Here, Howard Jonas repeatedly threatened the members of the Special Committee, thereby nullifying the burden-shifting effect that would otherwise follow from the Committee's approval. *See In re EZCORP Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *11 ("If a controller agrees to use only one of the protections, . . . then the most that the controller can achieve is a shift in the burden of proof such that the plaintiff challenging the transaction must prove unfairness.").

earn 'different consideration or some unique benefit' . . . flex[ed] his control to secure [a] self-interested deal to the detriment of minority stockholders."[222]

*Thorpe v. CERBCO, Inc.*,[223] relied on by Howard Jonas, does not support a different result. *CERBCO* involved controlling stockholders who usurped a corporate opportunity by attempting to sell one of CERBCO's subsidiaries without bringing that opportunity to CERBCO itself.[224] The Delaware Supreme Court agreed with the trial court that the controllers had breached the duty of loyalty.[225] The Supreme Court then turned to the issue of damages, distinguishing between damages caused by the breach and damages resulting from the controllers' "lawful exercise of statutory rights" in vetoing a potential transaction.[226] Because any damages stemming from "the nonconsummation of the transaction" resulted from the controllers' lawful exercise of their statutory rights, transactional damages could not be awarded.[227] But the Supreme Court held that other damages could be awarded for the controllers' disloyalty, including "any expenses . . . that the corporation incurred to accommodate the [controllers'] pursuit of their own interests prior to the deal being abandoned."[228] *CERBCO* thus has no bearing on the question before me,

---

[222] *Larkin*, 2016 WL 4485447, at *9.
[223] 676 A.2d 436 (Del. 1996).
[224] *Id.* at 438–39.
[225] *Id.* at 442.
[226] *Id.* at 444.
[227] *Id.*
[228] *Id.* at 445.

which is whether the Complaint pleads viable claims.[229] Issues involving the calculation of damages must await a developed factual record.[230]

### 2. Davidi Jonas

According to the Complaint, Davidi Jonas tipped off his father as to the Special Committee's plan to put the indemnification claim in a litigation trust. Davidi had reason to be concerned about the Special Committee's plan to preserve the claim. At the time of the sales process, he was a Straight Path director and the company's CEO, but he and his siblings held a 10% equity stake in IDT. Thus, it is reasonable to infer that Davidi was looking out for his own (and his family's) interests when he leaked the Special Committee's plan to his father. Nevertheless, Davidi argues that the Complaint fails to allege that he breached the duty of loyalty. He claims that his disloyal conduct cannot support a breach of fiduciary duty claim, because even if he had been a faithful fiduciary, his father would have inevitably learned everything necessary to extract non-ratable benefits at the minority stockholders' expense. This argument fails.

---

[229] Equally inapposite is *In re Countrywide Corp. Shareholders Litigation*, 2009 WL 846019 (Del. Ch. Mar. 31, 2009). True, in that case, former Vice Chancellor Noble held that a failure to preserve a derivative claim via a litigation trust was "a novel theory . . . unlikely to find success." *Id.* at *9. But the target board's actions in *Countrywide* were protected by the business judgment rule. *Id.* Here, by contrast, the Verizon merger is subject to entire fairness review as a result of Howard Jonas's extraction of unique benefits from the sales process.

[230] *See, e.g.*, *Chaffin v. GNI Grp., Inc.*, 1999 WL 721569, at *7 (Del. Ch. Sept. 3, 1999) ("On a motion to dismiss all that need be decided is whether a claim is stated upon which any relief could be granted. If that question is answered in the affirmative, the nature of that relief is not relevant and need not be addressed.").

45

As a Straight Path officer and director, Davidi owed fiduciary duties of care and loyalty to the company and its stockholders.[231] To establish a breach of fiduciary duty, a plaintiff must prove two elements: (i) the defendant owed a fiduciary duty, and (ii) the defendant breached the duty owed.[232]

"At the core of the fiduciary duty is the notion of loyalty—the equitable requirement that, with respect to the property subject to the duty, a fiduciary always must act in a good faith effort to advance the interests of his beneficiary."[233] Accordingly, "the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[234] "Corporate fiduciaries 'are not permitted to use their position of trust and confidence to further their private interests.'"[235] The duty of loyalty additionally requires a corporate fiduciary to act in good faith.[236] "A failure to act in good faith may be

---

[231] *See, e.g.*, *QC Commc'ns Inc. v. Quartarone*, 2014 WL 3974525, at *11 (Del. Ch. Aug. 15, 2014) ("Officers and directors of Delaware corporations owe fiduciary duties of care and loyalty to those corporations for which they serve.").

[232] *E.g.*, *Beach to Bay Real Estate Ctr. LLC v. Beach to Bay Realtors Inc.*, 2017 WL 2928033, at *5 (Del. Ch. July 10, 2017).

[233] *Dweck v. Nasser*, 2012 WL 161590, at *12 (Del. Ch. Jan. 18, 2012) (quoting *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *21 (Del. Ch. June 6, 1996)).

[234] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[235] *Frederick Hsu Living Trust v. ODN Holding Corp.*, 2017 WL 1437308, at *16 (Del. Ch. Apr. 14, 2017) (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)).

[236] *Id.*

shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[237]

The Complaint supports a reasonable inference that Davidi Jonas acted disloyally to Straight Path and its stockholders. Because he and his siblings held a significant equity stake in IDT, Davidi had a strong interest in seeing the indemnification claim eliminated. After all, successful pursuit of that claim could bankrupt IDT. Yet Straight Path and its stockholders would benefit from enforcing the claim. Thus, by tipping off his father about the Special Committee's plan to preserve and pursue the claim post-merger, Davidi put his personal interests above those of Straight Path and its stockholders. Indeed, it is reasonable to infer that Davidi made the tip precisely because he wanted his father to use his control over Straight Path to thwart the Special Committee's plan. Simply put, a loyal fiduciary would not have done what Davidi is alleged to have done. That is enough to state a claim for breach of the duty of loyalty.[238]

Davidi argues that he should be dismissed from this case because his father would have learned of the Special Committee's plan regardless of the tip. Davidi points out that, as Straight Path's controlling stockholder, Howard Jonas had to sign off on any merger. Presumably, Howard would not agree to vote his stock in favor

---

[237] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006).

[238] For the same reasons, the Complaint supports a reasonable inference that Davidi "intentionally act[ed] with a purpose other than that of advancing the best interests of the corporation." *Id.*

of a merger unless he understood its terms. A key component of the transaction structure proposed by the Special Committee was that the indemnification claim would be carved out from the sale and preserved in a litigation trust. Thus, before he agreed to support a merger, Howard would very likely learn of the Special Committee's plan. Once that happened, Howard would be in just as good a position to breach his fiduciary duties as he was when Davidi tipped him off.

Davidi misconstrues the pleading burden for claims of breach of fiduciary duty. A plaintiff's obligation at the pleading stage is simply to allege "(1) that a fiduciary duty exists and (2) that the fiduciary breached that duty."[239] Notably, resulting damages are absent from this list of elements. For the reasons explained above, the Plaintiffs have adequately alleged that Davidi breached the fiduciary duties he owed to Straight Path and its stockholders. Nothing more is required at this stage of the litigation. Davidi has not cited a single case supporting the proposition that, in addition to these two elements, the plaintiff must also allege the precise impact of a fiduciary's disloyal conduct. In any event, that is a fact-intensive question that cannot be answered on a Rule 12(b)(6) motion. Davidi's Motion to Dismiss is denied.

---

[239] *York Linings v. Roach*, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999).

### 3. Entire Fairness

Having determined that the Verizon merger is subject to entire fairness review, I now turn to Howard Jonas's argument that the Plaintiffs have failed to allege facts suggesting the transaction was unfair. I have already explained why the Complaint adequately alleges the sales process was tainted by Howard's improper efforts to pressure the Special Committee into doing a deal that favored him at the minority stockholders' expense. Thus, I need not further address whether the Plaintiffs have adequately alleged unfair dealing. But Howard also argues the Plaintiffs have failed to plead that the consideration Straight Path's stockholders received in the merger was unfair. This argument lacks merit.

"Under the entire fairness standard, the Court will inquire 'into two interrelated concepts: fair dealing and fair price.'"[240] Fair dealing encompasses "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[241] "The fair price aspect of the test ensures that the transaction was substantively fair by examining 'the economic and financial considerations.'"[242] "Entire fairness is this Court's most rigorous standard of

---

[240] *Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *9 (Del. Ch. Feb. 29, 2016) (quoting *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *9).
[241] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).
[242] *Williams v. Ji*, 2017 WL 2799156, at *5 (Del. Ch. June 28, 2017) (quoting *Weinberger*, 457 A.2d at 711).

review; the initial burden of proof is on the [defendant] to establish, to the Court's satisfaction, that the transaction was a product of fair dealing and at a fair price."[243]

If entire fairness applies at the pleading stage, dismissal is inappropriate "unless the [defendant] is able to show, conclusively, that the challenged transaction was entirely fair based solely on the allegations of the complaint and the documents integral to it."[244] Still, a plaintiff "must allege some facts that tend to show that the transaction was not fair."[245] The Plaintiffs here have met their pleading burden.

According to the Complaint, in exchange for $10 million and a portion of the proceeds from the IP Assets, Straight Path waived an indemnification claim potentially worth hundreds of millions of dollars.[246] As part of the same transaction, Straight Path sold IDT the IP Assets for $6 million, even though the Consent Decree itself suggests the Assets were worth approximately $50 million. These allegations are sufficient at the pleading stage to show that the reduction in merger consideration

---

[243] *Hamilton Partners, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014).

[244] *Id.*; *see also In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1180–81 (Del. 2015) ("When [entire fairness] is invoked at the pleading stage, the plaintiffs will be able to survive a motion to dismiss by interested parties regardless of the presence of an exculpatory charter provision because their conflicts of interest support a pleading-stage inference of disloyalty."); *Orman v. Cullman*, 794 A.2d 5, 21 n.36 (Del. Ch. 2002) ("A determination of whether the defendant has met [its] burden [in an entire fairness case] will normally be impossible by examining only the documents the Court is free to consider on a motion to dismiss—the complaint and any documents it incorporates by reference.").

[245] *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996).

[246] Notably, the indemnification claim may also have allowed Straight Path to recover from IDT for the loss of the forfeited licenses, the $15 million fine, and any expenses related to both the internal and FCC investigations.

caused by the settlement was unfair to Straight Path's stockholders. The Plaintiffs have thus adequately alleged unfair price.

Howard Jonas responds by asserting that the indemnification claim was probably worthless.[247] For example, Howard argues that the Plaintiffs have not alleged Straight Path gave IDT timely written notice of the FCC investigation, purportedly a condition precedent to the indemnification obligation. Howard also suggests that the indemnification claim was not triggered because IDT itself did not consent to the Consent Decree. And Howard claims that, even if Straight Path had the contractual right to pursue the indemnification claim against IDT, Straight Path would be barred as a matter of law from recovering from IDT any penalty paid to the FCC.

In my view, a motion to dismiss is not the appropriate vehicle for considering these arguments. The arguments boil down to the assertion that Straight Path had no chance of recovering anything from IDT via the indemnification claim, and thus that settlement of the claim—for any amount—was entirely fair. But the Complaint makes clear that the Special Committee and its legal advisors saw things differently.

---

[247] *See* IDT Defs.' Opening Br. 49 ("At bottom, Plaintiffs' pleading failures confirm that the keystone to their position—that the Indemnity Claim was somehow worth $150 million—is flat wrong. *That claim was likely worth nothing . . . .*" (emphasis added)). Oddly, in his reply brief, Howard Jonas appears to deny having taken the position that the indemnification claim had no value. *See* IDT Defs.' Reply Br. 31 ("Indeed, as explained above, Defendants' position is not that the Indemnification Claim had *no value* – it is that Plaintiffs have failed to adequately allege that the value at which it was settled (tens of millions of dollars) was *unfair*.").

They thought that Straight Path's chances of recovering the 20% penalty from IDT justified creation of the litigation trust. It is possible that the Special Committee and its lawyers at Shearman—a prominent law firm—misunderstood the Separation Agreement. But it is equally reasonable to infer that they did not, and at the pleading stage, the plaintiff gets the benefit of all reasonable inferences.[248] Moreover, it is hard to square the notion that the indemnification claim was worthless with Howard Jonas's alleged conduct in connection with settlement of the claim. According to the Complaint, this conduct included making personal threats to the members of the Special Committee—one of whom (William F. Weld) is the former Governor of Massachusetts.[249]

Finally, Howard Jonas argues that the Consent Decree's $50 million valuation of Straight Path's "Non-License Portfolio Assets" does not suggest the IP Assets were worth that amount. But the Complaint explicitly alleges that the vast majority of Straight Path's non-spectrum assets consisted of the IP Assets. And, according to the Plaintiffs, the $50 million figure in the Consent Decree came from Straight Path itself.[250] Thus, the Complaint supports a reasonable inference that the IP Assets were worth around $50 million, and that $6 million was therefore an unfair price.

---

[248] *See, e.g.*, *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) ("[T]he plaintiff is entitled to all reasonable inferences that logically flow from the face of the complaint.").
[249] In addition, IDT itself recognized in public filings that it could face liability for the penalties the FCC imposed on Straight Path.
[250] Compl. ¶ 54 n.3.

Further, while Howard claims that IDT simply matched the highest bid Straight Path had received for the IP Assets, that purported fact is not alleged or incorporated by reference in the Complaint, and so cannot be considered on a motion to dismiss.[251] Accordingly, the Complaint adequately alleges that the sale of the IP Assets at well below fair value helped render the merger consideration unfair.

In sum, the Plaintiffs have alleged enough facts to suggest that the Verizon merger, conditioned as it was on the transfer of assets to Howard Jonas's benefit, was unfair to Straight Path's stockholders. Of course, Howard Jonas is free to make the fact-intensive arguments advanced in his motion papers at a later stage of this litigation.

*C. Aiding and Abetting*

The Complaint charges IDT with aiding and abetting Howard and Davidi Jonas's breaches of fiduciary duty. The sole argument for dismissal of this claim is that the Complaint fails to plead any underlying breach of fiduciary duty. Because the Complaint adequately alleges Howard and Davidi committed breaches of fiduciary duty, the aiding and abetting claim survives.

---

[251] *See, e.g.*, *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014) ("[T]he universe of facts [on a Rule 12(b)(6) motion] is typically limited to the allegations of the complaint and any documents attached to it.").

*D. Declaratory Judgment and Constructive Trust*

Count IV of the Complaint seeks "an expedited declaratory judgment prior to the closing of the Verizon Transaction that Davidi Jonas and Howard Jonas breached their fiduciary duties by entering into" the settlement agreement.[252] Count IV also seeks the imposition of a constructive trust to allow the Plaintiffs "to pursue the Indemnification Claim on behalf of the stockholders and [have] the Court appoint a trustee to hold a free and fair auction for the IP Assets with the proceeds going to the stockholders."[253] These requests are premised on my finding that the Plaintiffs' claims are derivative, and they seek pre-closing relief. Because the Verizon merger has closed, and I have held that the Plaintiffs' claims are direct rather than derivative, Count IV is moot and must be dismissed.

### III. CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss are granted in part and denied in part. The parties should submit an appropriate form of order.

---

[252] Compl. ¶ 135.
[253] *Id.* ¶ 139.